**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FEDERAL TRADE COMMISSION**
   600 Pennsylvania Ave., N.W.
   Washington, D.C. 20580,

                    Petitioner,

*v.*

**THE CIGNA GROUP**
   900 Cottage Grove Rd.
   Bloomfield, CT 06002,

                    Respondent.

Case No.

**Memorandum in Support of Petition to Enforce Civil Investigative Demand**

**Table of Contents**

Introduction ........................................................................................................................ 1

Background ........................................................................................................................ 2

    A.  Cigna and its PBM Express Scripts ................................................................. 2

    B.  The FTC's mounting concerns about PBMs ................................................... 3

    C.  History of this law enforcement investigation CID ....................................... 6

Argument ......................................................................................................................... 12

I.   FTC administrative subpoenas are entitled to summary enforcement ................... 12

II.  The CID meets all requirements for enforcement ................................................. 13

    A.  The CID is within the Commission's authority ............................................ 14

    B.  The demands of the CID are definite ........................................................... 14

    C.  The CID seeks relevant information ............................................................. 15

    D.  The CID is not unreasonably broad or unnecessarily burdensome .............. 17

III. Cigna has not complied with the CID .................................................................... 19

IV. Cigna forfeited objections to the CID by failing to exhaust its administrative remedies ...... 21

Conclusion ....................................................................................................................... 23

## Table of Authorities

<u>**Cases**</u>

*Adams v. FTC,*
    296 F.2d 861 (8th Cir. 1961) ................................................................. 18

*CFPB v. Educ. Credit Mgmt. Corp.,*
    No. 21-mc-00019 (SRN/DTS), 2022 WL 102275 (D. Minn. Jan. 11, 2022) ...................... 20

*Doe v. United States,*
    253 F.3d 256 (6th Cir. 2001) ................................................................. 21

*EEOC v. Citicorp Diners Club, Inc.,*
    985 F.2d 1036 (10th Cir. 1993) ............................................................... 18

*EEOC v. McCormick & Schmick's,*
    No. C 07-80065 WHA, 2007 WL 1430004 (N.D. Cal. May 15, 2007) .............................. 19

*EEOC v. Quad/Graphics, Inc.,*
    63 F.3d 642 (7th Cir. 1995) .................................................................. 18

*EEOC v. United Air Lines, Inc.,*
    287 F.3d 643 (7th Cir. 2002) ................................................................. 13

*Endicott Johnson Corp. v. Perkins,*
    317 U.S. 501 (1943) .......................................................................... 15

*FTC v. Anderson,*
    631 F.2d 741 (D.C. Cir. 1979) ............................................................... 12

*FTC v. Carter,*
    464 F. Supp. 633 (D.D.C. 1979) ..................................................... 18, 19, 20

*FTC v. Carter,*
    636 F.2d 781 (D.C. Cir. 1980) ................................................. 13, 18, 19, 21

*FTC v. Complete Merch. Sols., LLC,*
    No. 2:19-cv-00996, 2020 WL 2059847 (D. Utah Apr. 28, 2020) ............................... 22

*FTC v. Dinamica Financiera LLC,*
    No. CV0804649, 2008 WL 11342612 (C.D. Cal. Sept. 22, 2008) .............................. 13

*FTC v. GlaxoSmithKline,*
    202 F.R.D. 8 (D.D.C. 2001) .............................................................. 21, 22

*FTC v. Invention Submission Corp.,*
    965 F.2d 1086 (D.C. Cir. 1992) ......................................................... 13, 15

*FTC v. Invention Submission Corp.,*
    Misc. No. 89-272 (RCL), 1991 WL 47104 (D.D.C. Feb. 14, 1991) ............................. 22

*FTC v. Ken Roberts Co.,*
    276 F.3d 583 (D.C. Cir. 2001) ............................................................... 20

*FTC v. LabMD, Inc.,*
    No. 1:12-cv-3005-WSD, 2012 WL 13104826 (N.D. Ga. Nov. 26, 2012) ......................... 13

*FTC v. MacArthur*,
    532 F.2d 1135 (7th Cir. 1976) ........................................................................................... 13

*FTC v. O'Connell Assoc., Inc.*,
    828 F. Supp. 165 (E.D.N.Y. 1993) .................................................................................... 22

*FTC v. Rockefeller*,
    591 F.2d 182 (2d Cir. 1979) ............................................................................................... 18

*FTC v. Texaco, Inc.*,
    555 F.2d 862 (D.C. Cir. 1977) ................................................................................... passim

*FTC v. Tracers Info. Specialists, Inc.*,
    No. 8:16-MC-18TGW, 2016 WL 3896840 (M.D. Fla. June 10, 2016) ............................... 22

*FTC v. XCast Labs, Inc.*,
    No. Misc. 21-1026 MWF (MRWx), 2021 WL 6297885 (C.D. Cal. Dec. 9, 2021) .............. 22

*FTC v. XCast Labs, Inc.*,
    No. Misc. 21-1026 MWF (MRWx), 2022 WL 60527 (C.D. Cal. Jan. 6, 2022) ................... 22

*In re Archuleta*,
    432 F. Supp. 583 (S.D.N.Y. 1977) .................................................................................... 21

*In re EEOC*,
    709 F.2d 392 (5th Cir. 1983) .............................................................................................. 13

*In re McVane*,
    44 F.3d 1127 (2d Cir. 1995) ............................................................................................... 13

*McLane Co., Inc. v. EEOC*,
    581 U.S. 72 (2017) .............................................................................................................. 15

*NLRB. v. Alaska Pulp Corp.*,
    No. 95-042 (GK), 1995 WL 389722 (D.D.C. May 25, 1995) ............................................. 15

*Ohio, ex rel. Yost v. Ascent Health Servs. LLC*,
    No. 23-cv-h-03-0179 (Ohio Ct. Com. Pl. Mar. 27, 2023) ...................................................... 4

*Osterhaus Pharmacy, Inc. v. CVS Health Corp.*,
    No. 2:23-cv-01500, 2023 WL 11921798 (W.D. Wash. Sept. 26, 2023) .............................. 4

*Petition of Borden Co.*,
    75 F. Supp. 857 (N.D. Ill. 1948) ....................................................................................... 21

*Platt, LLC v. OptumRx, Inc.*,
    No. A163061, 2023 WL 2507259 (Cal. Ct. App. Mar. 15, 2023) ........................................ 4

*Resol. Tr. Corp. v. Greif*,
    906 F. Supp. 1446 (D. Kan. 1995) .................................................................................... 14

*SEC v. Brigadoon Scotch Dist. Co.*,
    480 F.2d 1047 (2d Cir. 1973) ............................................................................................. 20

*Su v. Pamper Our Parents, Inc.*,
    No. 2:23-mc-03225 (NJC), 2024 WL 328807 (E.D.N.Y. Jan. 29, 2024) ............................ 20

*United States v. ASG Sols. Corp.*,
  No. 17CV1224 L (BGS), 2018 WL 1418023 (S.D. Cal. Mar. 22, 2018) .............................. 20

*United States v. Chevron U.S.A., Inc.*,
  186 F.3d 644 (5th Cir. 1999) ............................................................................................ 18

*United States v. Dynavac, Inc.*,
  6 F.3d 1407 (9th Cir. 1993) .............................................................................................. 13

*United States v. Firestone Tire & Rubber Co.*,
  455 F. Supp. 1072 (D.D.C. 1978) ..................................................................................... 18

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) ........................................................................................... 12, 14, 21

*Walsh v. Alight Sols. LLC*,
  44 F.4th 716 (7th Cir. 2022) ............................................................................................ 14

*Woodford v. Ngo*,
  548 U.S. 81 (2006) ........................................................................................................... 21

## **Statutes**

15 U.S.C. § 45 ...................................................................................................................... 4, 14

15 U.S.C. § 46 .......................................................................................................................... 4

15 U.S.C. § 49 .......................................................................................................................... 4

15 U.S.C. § 57 .......................................................................................................... 4, 14, 15, 21

## **Other Authorities**

Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating
  Drug Costs and Squeezing Main Street Pharmacies* (July 2024)....................................... 3, 6

S. 1542, 118th Cong. (2023) ("Delinking Revenue from Unfair Gouging Act").......................... 3

Staff of the H. Comm. on Oversight and Accountability, 118th Cong., *Rep. on The Role of
  Pharmacy Benefit Managers in Prescription Drug Markets* (2024) ................................... 3, 4

*The Role of Pharmacy Benefit Managers in Prescription Drug Markets Part I: Self-Interest or
  Health Care?: Hearing Before the H. Comm. on Oversight and Accountability*, 118th Cong.
  (2023).......................................................................................................................... 3

## **Regulations**

16 C.F.R. § 2.10 ..................................................................................................................... 21

16 C.F.R. § 2.7 ................................................................................................................. 14, 21

**Introduction**

In December 2023, the FTC issued a civil investigative demand ("CID") to The Cigna Group ("Cigna") as part of an investigation into the business practices of the three dominant pharmacy benefit managers ("PBMs")—Cigna's subsidiary Express Scripts, CVS/Caremark, and Optum. The investigation seeks to determine whether these three large PBMs are unlawfully harming pharmacy or PBM competition, such as by requiring their clients' beneficiaries to use the PBMs' own affiliated pharmacies or coercing unaffiliated pharmacies to accept oppressive contractual terms. The FTC has received numerous complaints about these practices, including hundreds of responses to an FTC request for public comments about PBM practices. The FTC is also separately conducting an industry study of the PBMs' practices, for which it issued a previous document request to Cigna in 2022.

Cigna has repeatedly delayed and obstructed the compliance process. For the first nine months that Cigna had the CID, it refused to commit to a timeline for productions and the only documents it turned over (beyond what it produced for the FTC's separate industry study) were a handful of organization charts. Staff agreed to narrow the scope of the CID's requests in exchange for Cigna's commitment to a reasonable production timeline, but Cigna nonetheless failed to meet that timeline. To date, Cigna has produced only a fraction of the documents required by the CID that were not previously produced for the FTC's study. Cigna also refuses to provide basic information about the status of its compliance efforts. Cigna's failure to meaningfully respond to the CID has delayed the Commission's investigation. It is now clear that a court order is necessary to secure Cigna's compliance.

The CID meets all legal requirements for enforcement: it was lawfully issued and sufficiently definite; the records sought are relevant to the Commission's investigation; and the requests are not unduly burdensome. Cigna never filed a petition to quash the CID and so has

waived any objections to the CID. The Court should order Cigna to show cause why it should not fully comply with the agreed-upon narrowed CID requests, and thereafter set a definitive date for compliance within 30 days.

## Background

### A. Cigna and its PBM Express Scripts

The Cigna Group is a healthcare conglomerate with annual revenues of nearly $200 billion and routinely ranks in the top 20 largest companies in the United States.[1] In December 2018, Cigna purchased a PBM called Express Scripts for approximately $52 billion.[2] PBMs manage prescription drug benefits for health plan sponsors, acting as middlemen between plan sponsors and their beneficiaries, on the one hand, and pharmacies on the other. In this role, PBMs assemble networks of pharmacies and offer these networks to plan sponsors as part of an overall package of services. Once a plan sponsor agrees to a network, its beneficiaries are required to fill prescriptions at an in-network pharmacy to obtain insurance coverage. After dispensing a drug to one of these beneficiaries, the pharmacy then submits a reimbursement claim against the consumer's health plan, which the PBM processes and adjudicates. PBMs require pharmacies to accept certain reimbursement rates and other terms to join the PBMs' networks.

---

[1] The Cigna Group, 2023 ANNUAL REPORT (2024), at 3, https://s202.q4cdn.com/757723766/files/doc_financials/2023/ar/2023-Annual-Report.pdf (annual revenue of $195.3 billion); *Fortune Global 500*, FORTUNE (last visited Jan. 13, 2025), https://fortune.com/ranking/global500/ (listing Cigna in top 20 largest U.S. companies for 2024).

[2] Katie Thomas, Reed Abelson, and Chad Bray, *Cigna to Buy Express Scripts in $52 Billion Health Care Deal*, NEW YORK TIMES (Mar. 8, 2018), https://www.nytimes.com/2018/03/08/business/dealbook/cigna-express-scripts.html.

Express Scripts is one of the three largest PBMs in the United States.[3] It manages approximately 23% of all U.S. prescription claims,[4] and services more than 100 million beneficiaries.[5] Express Scripts also owns the largest mail order pharmacy in the U.S.,[6] and the second largest specialty pharmacy in the U.S., Accredo,[7] which it purchased in April 2012.[8]

### B.  The FTC's mounting concerns about PBMs

PBMs have been the subject of increasing public scrutiny as potential contributors to ever-increasing prescription drug costs. Their position as middlemen between health plans, pharmaceutical manufacturers, and pharmacies gives them significant power to influence pharmacy usage and prescription drug dispensing. In the last several years, there have been bipartisan calls to investigate the PBMs' practices.[9] The House Committee on Oversight and Accountability recently issued a report finding that "PBMs inflate prescription drug costs and interfere with patient care for their own financial benefit."[10] Among other conclusions, the

---

[3] Adam J. Fein, *The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies—And What's Ahead*, DRUG CHANNELS INST. (Apr. 9, 2024), https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html.

[4] *Id.*

[5] Evernorth, *By the numbers: How Express Scripts Saved Members Money in 2022* (Nov. 7, 2023), https://www.evernorth.com/articles/prescription-savings-express-scripts-2022 (referring to the "more than 100 million Americans" Express Scripts serves).

[6] Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (July 2024), at 20 (Figure 6), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

[7] Adam J. Fein, *The Top 15 Specialty Pharmacies of 2023: Market Shares and Revenues at the Biggest PBMs, Health Plans, and Independents*, DRUG CHANNELS INST. (Apr. 16, 2024), https://www.drugchannels.net/2024/04/the-top-15-specialty-pharmacies-of-2023.html.

[8] Express Scripts Holding Co., 2012 ANNUAL REPORT (2013) at 2, https://www.sec.gov/Archives/edgar/data/1532063/000119312513063930/d450292d10k.htm.

[9] *See, e.g.*, *The Role of Pharmacy Benefit Managers in Prescription Drug Markets Part I: Self-Interest or Health Care?: Hearing Before the H. Comm. on Oversight and Accountability*, 118th Cong. (2023); S. 1542, 118th Cong. (2023) ("Delinking Revenue from Unfair Gouging Act").

[10] Staff of the H. Comm. on Oversight and Accountability, 118th Cong., *Rep. on the Role of Pharmacy Benefit Managers in Prescription Drug Markets*, at 3 (2024).

Committee found that "the big three PBMs own their own pharmacies, disincentivizing negotiation, enabling benefitting from higher prices, and hurting their competition by reducing patients' pharmacy choices."[11]

Various public and private lawsuits have also been filed to challenge certain PBM practices. *See, e.g.*, *Osterhaus Pharmacy, Inc. v. CVS Health Corp.*, No. 2:23-cv-01500, 2023 WL 11921798 (W.D. Wash. Sept. 26, 2023) (challenging CVS Health's imposition of significant and retroactive fees on pharmacies in Medicare Part D networks); *Platt, LLC v. OptumRx, Inc.*, No. A163061, 2023 WL 2507259 (Cal. Ct. App. Mar. 15, 2023) (alleging that OptumRx diverts business from rival non-affiliated pharmacies by reimbursing them below their costs to acquire drugs); Complaint at 20, *Ohio, ex rel. Yost v. Ascent Health Servs. LLC*, No. 23-cv-h-03-0179 (Ohio Ct. Com. Pl. Mar. 27, 2023) (challenging pharmacy network agreements that allow the PBM to reimburse pharmacies below their acquisition costs, require pharmacies to pay exorbitant fees, and are "driving many [pharmacies] to the brink of insolvency or closure").

The FTC is an administrative agency of the United States government authorized to investigate, and bring a law enforcement action to prevent, the use of unfair methods of competition and unfair or deceptive acts or practices. 15 U.S.C. §§ 45(a), 46, 49, 57-b1. Additionally, Section 6(b) of the FTC Act authorizes the Commission to conduct industry studies that do not have a specific law enforcement purpose. 15 U.S.C. § 46(b). To facilitate these studies, the Commission can issue orders to industry participants requiring them to provide information about their "organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals." *Id.*

---

[11] *Id.* at 11.

In February 2022, the FTC solicited public comments on "the Impact of Prescription Benefit Managers' Business Practices."[12] The FTC received more than 1,200 comments.[13] Many of these comments complained that practices by the three major PBMs—including Express Scripts—led to reduced competition and harmed pharmacies that were not affiliated with one of the PBMs. Commenters stated that the three largest PBMs use various strategies to steer beneficiaries to their own affiliated specialty pharmacies. For example, some commenters complained that PBMs' benefit designs require patients to pay more out of pocket at non-affiliated pharmacies than at the PBMs' pharmacies. Others noted that PBMs require providers dispensing drugs in clinical settings (such as doctors' offices) to obtain those drugs only from the PBMs' affiliates. And some commenters noted instances of patients being outright blocked from obtaining specialty drugs at non-affiliated pharmacies. Other commenters asserted that these steering strategies result in dramatic profits for the PBMs, in part because they pay their own affiliated specialty pharmacies more than they pay unaffiliated pharmacies for the same drugs.

Commenters also contended that the PBMs use their dominance to impose oppressive terms on unaffiliated pharmacies who need to join the PBMs' pharmacy networks. For example, commenters noted that the PBMs' pharmacy network agreements require pharmacies to pay significant fees based on vague and variable performance metrics over which the pharmacies themselves have limited control. Others noted that these agreements allow PBMs to reimburse unaffiliated pharmacies at constantly changing rates for certain drugs that are not disclosed to the

---

[12] *See* Federal Trade Commission, *Solicitation for Public Comments on the Impact of Prescription Benefit Managers' Business Practices*, Dkt. No. FTC-2022-0015, https://www.regulations.gov/docket/FTC-2022-0015 (1,238 comments posted to docket).

[13] The comments are available at https://www.regulations.gov/docket/FTC-2022-0015/comments.

pharmacies in advance. This tactic allegedly enhances the PBMs' ability to reimburse the member pharmacies at lower rates.

In June 2022, the FTC began a PBM industry study and issued orders pursuant to Section 6(b) of the FTC Act ("the 6(b) orders") to the six largest PBMs, including Express Scripts.[14] The 6(b) orders requested data and documents regarding the recipients' businesses and business practices. In July 2024, the FTC issued an Interim Staff Report with preliminary findings from the 6(b) orders.[15] This interim report found that "PBMs and their affiliated entities may have the incentive and ability to engage in steering a growing share of prescription revenues to their own pharmacies through specialty drug classification, self-preferential pricing, and pharmacy contracting procedures to target and control the business operations of pharmacies."[16] On January 14, 2025, the Commission issued a Second Interim Staff Report detailing further findings.[17]

### C.  History of this law enforcement investigation CID

In fall 2023, the FTC opened this investigation into whether the three largest PBMs' business practices violated any of the laws enforced by the FTC. On December 8, 2023, the FTC issued a civil investigative demand to Cigna pursuant to a 2021 Commission resolution authorizing CIDs to investigate potential anticompetitive conduct affecting healthcare markets,

---

[14] *See* Press Release, Federal Trade Commission, FTC Launches Inquiry Into Prescription Drug Middlemen Industry (June 6, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-launches-inquiry-prescription-drugmiddlemen-industry.

[15] *See* Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* (July 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf.

[16] *Id.* at 71.

[17] *See* Federal Trade Commission, *Specialty Generic Drugs: A Growing Profit Center for Vertically Integrated Pharmacy Benefit Managers* (January 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/PBM-6b-Second-Interim-Staff-Report.pdf.

specifically including conduct by PBMs.[18] The CID was signed pursuant to Section 2.7(a) of the Commission's Rules of Practice. Pet. Ex. 2 at 1; 16 C.F.R. § 2.7(a).

Unlike the FTC's industry study, which sought to study the PBM industry generally, this investigation seeks to determine whether any pharmacy-related conduct by Cigna or the conglomerates operating the other two largest PBMs violates any of the laws enforced by the FTC. To answer this question, Staff needs to understand Cigna's power in the markets for PBM and pharmacy services; the relationship between Cigna's PBM and pharmacy businesses; Cigna's pharmacy network contracting practices and terms; and whether and how Cigna steers prescriptions to Cigna-affiliated pharmacies. The CID seeks documents, data, and other information addressing these topics. In particular, it seeks: (a) information about Cigna's corporate structure and finances; (b) documents and data regarding Cigna's pharmacy services and PBM services; (c) information about Cigna's pharmacy contracting practices and pharmacy network construction; and (d) information about Cigna's efforts to require clients' beneficiaries to use its affiliated specialty pharmacy. Pet. Ex. 1 ("Goldenberg Decl.") ¶ 8; Pet. Ex. 2. The CID noted that, pursuant to 15 U.S.C. § 57b-1(f) and 16 C.F.R. § 2.10, Cigna had 20 days to raise any factual or legal objections to the CID by filing a petition to limit or quash the requests. Pet. Ex. 2 at 1; Goldenberg Decl. ¶ 9. Cigna did not file such a petition. Goldenberg Decl. ¶ 10.

The CID differs in scope from the FTC's prior 6(b) order to Cigna. Some of the requested information overlaps, and in those areas Staff sought to minimize the burden on Cigna by allowing it to simply re-produce or identify as responsive the documents it had already produced in response to the 6(b) order. *Id*. ¶ 13. But the CID also requests additional information that was

---

[18] *See* Press Release, Federal Trade Commission, FTC Authorizes Investigation into Key Enforcement Priorities (July 1, 2021), *available at* https://www.ftc.gov/news-events/news/press-releases/2021/07/ftc-authorizes-investigations-key-enforcement-priorities.

not necessary for the Commission's 6(b) study but is necessary for its law enforcement purpose. *Id.* ¶¶ 12-13. Specifically, whereas the 6(b) order only requested documents and information created before June 2022, the CID seeks information up to the present. *Id.* The CID also seeks information on numerous topics not covered by the 6(b) orders, and materials in the possession, custody, or control of Cigna, not just Express Scripts. *Id.*

The CID also differs in scope from the FTC's separate investigation and lawsuit related to Express Scripts' (and the other large PBMs') rebate practices. On September 20, 2024, the FTC sued Express Scripts, Caremark Rx, and OptumRx for anticompetitive and unfair rebating practices. That suit alleges that the defendants negotiate with manufacturers to maximize rebates rather than to lower prices, and design and sell prescription drug formularies that favor higher-list price (and higher-rebate) products, which shifts costs to vulnerable patients. That lawsuit is pending in the FTC's internal administrative court. This CID does not request information relating to formulary management and manufacturer rebate contracting, the subjects at issue in that lawsuit. Goldenberg Decl. ¶ 12.

Since the CID was issued 13 months ago, Cigna has repeatedly delayed compliance. *Id.* ¶ 14. The deadline specified in the CID was January 8, 2024, which Staff extended once to February 8, 2024. *Id.* ¶ 17. Cigna failed to meet that deadline and has been out of compliance with the CID ever since. *Id.* For several months after the CID was issued, Cigna resisted providing information not already covered by the 6(b) order—to which it still had not finished responding, despite having 18 months to do so. *Id.* ¶¶ 18-21. Staff explained to Cigna several times that the CID required different information for law enforcement purposes and that Cigna was obligated to work with Staff to identify a reasonable plan for providing such information. *Id.* ¶¶ 15, 19-21.

Following initial meet and confers in January and February 2024, Cigna did not respond to Staff's requests for basic information about potential document custodians (for example, how many employees reported to them) for six weeks, despite repeated follow ups from Staff. *Id.* ¶¶ 15, 19-20. In early April, Cigna declared that it would collect documents only from employees who had previously been identified as custodians for the 6(b) order—even though Staff had identified 12 other employees who were likely to have responsive documents. *Id.* ¶¶ 20-21. And Cigna never explained why these 12 other employees were unlikely to possess responsive materials. *Id.* ¶ 21. After it was clear the parties had reached impasse, Staff informed Cigna that the FTC would likely file a CID enforcement action unless Cigna agreed to produce documents from these additional custodians. *Id.* Following six weeks of further negotiations, Cigna agreed to produce documents from eight of the 12 additional custodians. *Id.* ¶ 22.

But despite this commitment, Cigna continued to stonewall the investigation. For example, in late May 2024, more than four months after Staff first requested that Cigna propose search terms it would use to identify relevant custodial documents, Cigna finally committed to doing so. *Id.* ¶ 22. But it never followed through. Instead, after waiting three weeks for Cigna's promised search term proposal, Staff compiled and sent its own list of proposed search terms. *Id.* ¶ 23. Cigna did not respond to Staff's proposal for over a month. *Id.* ¶ 24. Then, in July, in another effort to work toward compliance, Staff offered to let Cigna prioritize certain custodians and time periods and narrow the proposed search terms if Cigna agreed to finish its production by October 2024. *Id.* ¶ 25. On August 9, Cigna agreed to the narrower list of custodians and proposed to further narrow the FTC's search terms, but rejected Staff's production timeline. *Id.* ¶ 26. Cigna stated instead that it hoped to end by early December but may need to adjust that timeline even further. *Id.*

On August 12, Staff informed Cigna that Staff had serious concerns with Cigna's failure to make meaningful progress to comply with the CID. *Id.* ¶ 27. In the eight months since the CID was issued, Cigna had produced no documents or data beyond what it had already produced in response to the 6(b) order, other than organizational charts. *Id.* Staff notified Cigna that, if it did not commit to a reasonable timeline for compliance, Staff would recommend a CID enforcement action. *Id.* In response, Cigna agreed to produce by October 31 the documents Staff had prioritized and by November 15 the corresponding data. *Id*. ¶ 28.

Cigna did not meet these commitments. As of October 31, Cigna had produced fewer than 15,000 custodial documents—even though Cigna's own initial estimates suggest there are hundreds of thousands of unproduced responsive documents. *Id*. ¶¶ 29.[19] In mid-November, Cigna produced around 4,500 additional documents and then stated that it would complete its document production by December 31. *Id*. ¶¶ 29-30. Again, Cigna failed to meet this deadline. *Id.* ¶ 30. In fact, since making that commitment in November, Cigna has not produced a single additional document. *Id*. Cigna has provided no explanation for this failure. *Id*. Cigna has also refused to provide simple information on the status of its productions, including how many documents are in its review set and how many documents it has reviewed. *Id.* ¶¶ 29, 31. And, while Cigna eventually produced much of the data requested by the CID, it did not do so until nearly a year after the CID was issued—and still, important gaps remain.[20]

---

[19] Cigna estimated that Staff's initial proposed search terms would hit 1.6 *million* responsive documents. Goldenberg Decl. ¶ 31. Although the list of search terms was modified in subsequent negotiations, *id*. ¶¶ 26, 28, that modification does not explain the vast gap between the number of initially identified potentially responsive documents and the number produced.

[20] Cigna's production of data was delinquent by its own standards: Cigna initially told Staff that it intended to produce all data by May 2024, but did not end up producing the data until November. Goldenberg Decl. ¶ 29 n.1. And important data still remains unproduced: Cigna did not provide any of the data on non-commercial payor types required by Specification 13, and has not produced data on specialty networks, despite telling the FTC that it intended to produce that data in November. *Id.*

On January 14, 2025, a news article leaked the Commission's plan to file this enforcement action that day. Hours later, Cigna emailed Staff and stated that it was preparing to make additional unspecified productions. Goldenberg Decl. ¶ 32. As discussed in this memorandum, Cigna otherwise had not made a document production in nearly two months, had not provided answers to any of Staff's requests for updates, and ignored its December 31 deadline without comment. *Id.* As also discussed, Cigna has previously responded to the prospect of subpoena enforcement actions by making commitments and small productions, only to disengage once the threat of subpoena enforcement receded. Cigna's vague, last minute production proclamations appear to be spurred directly by the Commission's enforcement action and do not indicate to Staff that Cigna will now, in contrast to its conduct to date, make good on its promises.

In sum, 13 months after the CID was issued, Cigna has engaged in a series of acts to delay and obstruct progress of the FTC's investigation. Despite Staff's repeated requests for a timeframe for compliance—dating back to December 2023 and continuing with repeated follow-up requests via email and teleconference—Cigna provided no comprehensive or concrete timeline for productions of new materials until August 2024. It then failed to meet both its own initial proposed deadline and a subsequent deadline it proposed. Cigna has refused to provide Staff with any information on the status of its efforts to respond and, to date, has produced fewer than 20,000 documents that were not already produced in response to the 6(b) order. Indeed, Cigna only contacted Staff with a vague, last-minute claim of additional productions after public reports of this very filing. Goldenberg Decl. ¶ 32. Cigna makes no claim that its documentary production is even close to complete. Cigna's failure to comply has prevented the Commission

from completing its investigation into whether any of Cigna's business practices—including those raised in public complaints—are illegal.

## Argument

Cigna's year-long refusal to comply with the CID is preventing Staff from obtaining the information it needs to conduct its investigation. The Court should summarily enforce the CID, as narrowed by Staff and Cigna's August 2024 agreement revising the search terms and limiting custodians. The CID meets all legal requirements for enforcement: it was lawfully issued and sufficiently definite; the records sought are relevant to the Commission's investigation; and the requests are not unduly burdensome. Even though the CID was issued over a year ago, Cigna still has not complied. Moreover, Cigna has waived any objections to the CID because it never filed a petition to quash or modify the CID.

## I.    FTC administrative subpoenas are entitled to summary enforcement

"[T]he court's role in a proceeding to enforce an administrative subpoena is a strictly limited one." *FTC v. Texaco, Inc.*, 555 F.2d 862, 871-72 (D.C. Cir. 1977) (*en banc*). "[W]hile the court's function is 'neither minor nor ministerial,' the scope of issues which may be litigated in an enforcement proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity." *Id.* at 872 (internal citation omitted) (quoting *Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 217 n.57 (1946)); *accord FTC v. Anderson*, 631 F.2d 741, 744-45 (D.C. Cir. 1979). The issue before the Court is simply whether "the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950); *see Texaco*, 555 F.2d at 872.

Proceedings to enforce administrative investigative subpoenas—like the civil investigative demand here—are entitled to summary disposition. *EEOC v. United Air Lines, Inc.*,

287 F.3d 643, 649 (7th Cir. 2002). They are special statutory matters cognizable under Federal Rule of Civil Procedure 81(a)(5) and are properly instituted by a petition for enforcement seeking an order to show cause (rather than by a complaint and summons). *See, e.g.*, *FTC v. MacArthur*, 532 F.2d 1135, 1141-42 (7th Cir. 1976). Courts can promptly issue a show cause order upon receiving an enforcement petition. *See, e.g.*, *FTC v. LabMD, Inc.*, No. 1:12-cv-3005-WSD, 2012 WL 13104826, at *2 (N.D. Ga. Nov. 26, 2012) (issuing show cause order one week after petition was filed); *FTC v. Dinamica Financiera LLC*, No. CV0804649, 2008 WL 11342612, at *2 (C.D. Cal. Sept. 22, 2008) (issuing show cause order the day after petition was filed). Absent extraordinary circumstances, "discovery is improper in a summary subpoena enforcement proceeding." *FTC v. Carter*, 636 F.2d 781, 789 (D.C. Cir. 1980) (quoting *United States v. Exxon Corp.*, 628 F.2d 70, 77 n.7 (D.C. Cir. 1980)); *accord FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1091 (D.C. Cir. 1992).

## II.    The CID meets all requirements for enforcement

A district court must enforce agency investigative process so long as "[1] the inquiry is within the authority of the agency, [2] the demand is not too indefinite, and [3] the information sought is reasonably relevant." *Texaco*, 555 F.2d at 872 (quoting *Morton Salt*, 338 U.S. at 652). Courts may also consider whether "the demand is unduly burdensome." *Texaco*, 555 F.2d at 881-82. "An affidavit from a government official is sufficient to establish a prima facie showing that these requirements have been met." *In re McVane*, 44 F.3d 1127, 1136 (2d Cir. 1995); *accord MacArthur*, 532 F.2d at 1141-42; *In re EEOC*, 709 F.2d 392, 400 (5th Cir. 1983); *United States v. Dynavac, Inc.*, 6 F.3d 1407, 1414 (9th Cir. 1993). The FTC's CID to Cigna meets these standards.

### A.  The CID is within the Commission's authority

The FTC Act confers broad powers on the FTC to investigate and prevent unfair methods of competition and unfair or deceptive acts or practices. 15 U.S.C. § 45. In the exercise of its powers, the Commission may issue CIDs to any person who may have documents or information relevant to an investigation regarding unfair methods of competition or unfair or deceptive acts or practices. 15 U.S.C. § 57b-1(c)(1). The FTC may "investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642-43.

The FTC issued this CID pursuant to 15 U.S.C. § 57b-1 and the Commission's Resolution Directing Use of Compulsory Process Regarding Acts or Practice Affecting Healthcare Markets. Pet. Ex. 3. The CID seeks information to determine whether Cigna's PBM practices are unfair methods of competition or unfair or deceptive acts or practices in violation of the FTC Act. *See* 15 U.S.C. § 45(a)(1). The CID complies with the applicable procedural requirements of the FTC Act and its implementing rules. 15 U.S.C. § 57b-1(c)(1)-(5); 16 C.F.R. § 2.7. It was signed by the FTC Chair acting pursuant to the resolution by the full Commission authorizing the use of compulsory process. *See* Pet. Ex. 2 at 1; 15 U.S.C. § 57b-1(i); 16 C.F.R. § 2.7(a). It thus conforms to all legal requirements and is within the scope of the FTC's authority.

### B.  The demands of the CID are definite

A CID is sufficiently definite when it describes the required information such "that a person can in good faith understand which documents must be produced." *Resol. Tr. Corp. v. Greif*, 906 F. Supp. 1446, 1452 (D. Kan. 1995); *accord Walsh v. Alight Sols. LLC*, 44 F.4th 716, 724 (7th Cir. 2022). Here, the CID identifies the nature of the conduct being investigated and states the law at issue. Pet. Ex. 2 at 1 (identifying the "Subject of Investigation"); 15 U.S.C. § 57b-1(c)(1). It contains 43 specifications that ask for specified documents and information.

These specifications are further clarified in 46 defined terms, which bring "definiteness and certainty" to each category of documents or data sought and each question needing to be answered. *See, e.g.*, 15 U.S.C. § 57b-1(c)(2)(a). The CID identifies the specific records custodians to whom the responses are to be sent and specifies January 8, 2024 as the date for providing responses. *See* Pet. Ex. 2 at 1. *See, e.g.*, 15 U.S.C. § 57b-1(c)(3)(B)-(C).

### C.  The CID seeks relevant information

The information sought by the CID is relevant to the FTC's investigation. "The standard for judging relevance in an investigatory proceeding is more relaxed than in an adjudicatory one" because "the Commission does not seek information necessary to prove specific charges; it merely has suspicion that the law is being violated in some way and wants to determine whether or not to file a complaint." *Invention Submission*, 965 F.2d at 1089. "The term 'relevant' [should] be understood 'generously' to permit the [agency] access to virtually any material that might cast light on [the inquiry]." *McLane Co., Inc. v. EEOC*, 581 U.S. 72, 84 (2017); *see also Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943) (quoting *E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 68–69 (1984)) (administrative subpoena should be enforced unless the evidence sought is "plainly incompetent or irrelevant to any lawful purpose of the [agency]"); *NLRB v. Alaska Pulp Corp.*, No. 95-042 (GK), 1995 WL 389722, at *5 (D.D.C. May 25, 1995) (so long as the information requested "touches a matter under investigation, an administrative subpoena will survive a challenge that the material is not relevant" (cleaned up)). Moreover, "the agency's own appraisal of relevancy must be accepted so long as it is not obviously wrong." *Invention Submission*, 965 F.2d at 1089 (cleaned up).

The present investigation seeks to determine whether some of Cigna's business practices—particularly its conduct affecting pharmacies—violate the antitrust laws or FTC Act. This requires assessment of Cigna's power in the markets for PBM and pharmacy services; the

relationship between Cigna's PBM and pharmacy businesses; Cigna's pharmacy network contracting practices and terms; and whether and how Cigna steers prescriptions (and the resulting profits) to Cigna-affiliated pharmacies. The CID's specifications seek information to assess these questions.

Specifications 1-7 seek information about Cigna's corporate structure and finances, which Staff needs to understand the relationship between Cigna's PBM and pharmacy businesses, and the identity of relevant employees involved in these businesses.

Specifications 8-12 seek documents discussing pharmacy or PBM services. Staff needs this information to understand Cigna's strategic plans, policies, and programs for its PBM and pharmacy businesses, as well as their effects on competition.

Specifications 13-24 seek data relating to Cigna-affiliated pharmacies and pharmacy networks, and documents relating to fees, adjustments, payments, and reimbursements made to pharmacies for the dispensing of drugs or provision of pharmacy services. The information requested by these specifications will help Staff identify pharmacy reimbursement rates and fees across pharmacies, pharmacy networks, and drug lists, and determine whether Cigna reimburses or makes other payments to its affiliated pharmacies at higher rates than it does for non-affiliated pharmacies.

Specifications 25-31 seek documents and information relating to how Cigna develops, administers, and negotiates participation in its pharmacy networks, including its contracting practices and its evaluation of participating pharmacies, as well as copies of its contracts relating to PBM or pharmacy services. Staff needs this information to evaluate whether and how Cigna steers business to its own affiliated pharmacies, including by imposing oppressive or unfair terms on non-affiliated pharmacies that desire to join Cigna's networks.

Specification 32 seeks documents relating to Cigna's pharmacy audit policies and results, including performance standards. Staff needs this information to evaluate Cigna's pharmacy audit practices and their potential impact on pharmacy competition, and the relationship between Cigna's PBM and pharmacy businesses.

Specification 33 seeks documents relating to completed or contemplated transactions with other pharmacies. Staff needs this information to understand the observed or forecasted competitive effects of these acquisitions, and the relationship between Cigna's PBM and pharmacy businesses.

Specifications 34-39 seek documents and information related to Cigna's policies and efforts to require, direct, encourage, or incentivize patients to utilize Cigna's affiliated specialty or mail-order pharmacies. Staff needs this information to understand whether and how Cigna steers patients to affiliated pharmacies, and whether, and how, its decisions to designate certain drugs as "specialty" (such that beneficiaries can generally only obtain them from a specialty pharmacy) play a role in any such steering.

Specifications 40-43 request documents and information about Cigna's process for complying with the CID.

These requests are plainly relevant to the FTC's investigation. Indeed, apart from a single letter to Staff containing boilerplate objections, Cigna has not suggested otherwise. Goldenberg Decl. ¶ 33.

### D. The CID is not unreasonably broad or unnecessarily burdensome

District courts may "impose reasonable conditions and restrictions" on administrative compulsory process when "the demand is unduly burdensome." *Texaco*, 555 F.2d at 881. However, "[s]ome burden on the subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." *Id*. at 882. CID

respondents thus must show that "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *Id.*; *accord EEOC v. Citicorp Diners Club, Inc.*, 985 F.2d 1036, 1040 (10th Cir. 1993); *EEOC v. Quad/Graphics, Inc.*, 63 F.3d 642, 645 (7th Cir. 1995). That burden is "not easily met." *Texaco*, 555 F.2d at 882. "Broadness alone is not sufficient justification to refuse enforcement of a subpoena so long as the material sought is relevant." *Adams v. FTC*, 296 F.2d 861, 867 (8th Cir. 1961).

Cigna cannot plausibly claim that compliance would unduly hinder its business. Cigna is one of the largest companies in the United States.[21] It plainly has the resources to comply with the CID without threatening its business operations. *See, e.g.*, *United States v. Chevron U.S.A., Inc.*, 186 F.3d 644, 650 (5th Cir. 1999) (noting Chevron's relative size in assessing burden); *FTC v. Rockefeller*, 591 F.2d 182, 190 (2d Cir. 1979) (holding subpoenas "do not appear to pose a threat to the normal operations of appellants' businesses considering their size"). The costs to Cigna of complying "are [not just] minor relative to [its] financial position." *FTC v. Carter*, 464 F. Supp. 633, 641 (D.D.C. 1979), *aff'd*, 636 F.2d 781 (D.C. Cir. 1980). They are also minor "when measured against the public interest of this investigation." *Id.* And Cigna has already had 13 months to gather the materials requested by the CID. *See, e.g.*, *United States v. Firestone Tire & Rubber Co.*, 455 F. Supp. 1072, 1084 (D.D.C. 1978) (no undue burden, even for an "extensive" order to produce information, because "[i]t cannot be said in this case that [recipient] will be severely hampered in conducting its business if it is forced finally to produce information which it has known for six months was being sought").

---

[21] *Fortune Global 500*, FORTUNE (last visited Jan. 13, 2025), https://fortune.com/ranking/global500/ (listing Cigna in top 20 largest U.S. companies for 2024).

Staff has also taken multiple steps to reduce the burden on Cigna. Staff drafted the CID so that many of the specifications could be satisfied wholly or in part by the materials Cigna produced in the FTC's 6(b) study on PBM practices and agreed to accept those documents without further review of them by Cigna. *See* Goldenberg Decl. ¶ 13; *Carter*, 464 F. Supp. at 641, *aff'd*, 636 F.2d 781 (D.C. Cir. 1980) ("[T]he subpoenas have been tailored to minimize burden, for example by allowing respondents . . . to indicate documents already turned over to the Commission in other investigations."). For custodians whose documents were collected for the PBM industry study, Staff agreed to limit further document searches to the period that post-dated the 6(b) order requests. *See EEOC v. McCormick & Schmick's*, No. C 07-80065 WHA, 2007 WL 1430004, at *7 (N.D. Cal. May 15, 2007) (crediting agency's internal coordination to review documents produced by respondent to other divisions). And, as described above, Staff reached an August agreement with Cigna that significantly narrowed the search terms and custodians for Cigna's response.

### III.    Cigna has not complied with the CID

Despite the CID issuing more than a year ago, Cigna has not complied with it. Cigna has produced only a small volume of responsive materials, has repeatedly delayed and obstructed compliance efforts, and has missed multiple negotiated deadlines. To date, Cigna has produced fewer than 20,000 documents that respond specifically to this CID (as opposed to the FTC's prior 6(b) order), and stated that it plans to make additional unspecified productions only after public reports of this very filing. Cigna's own initial estimates suggest the number of unproduced responsive documents is at least in the hundreds of thousands. Cigna has also refused to provide basic information, such as the number of documents containing the search terms Cigna agreed to with Staff. And, after missing its last commitment to finish its production by December 2024, Cigna has provided no timeline for compliance.

19

The "very backbone of an administrative agency's effectiveness" is "the rapid exercise of the power to investigate." *Texaco*, 555 F.2d at 872-73 (quoting *Fed. Maritime Comm'n v. Port of Seattle*, 521 F.2d 431, 436 (9th Cir. 1975)); *accord SEC v. Brigadoon Scotch Dist. Co.*, 480 F.2d 1047, 1052-53 (2d Cir. 1973). And partial or delayed compliance with a subpoena does not satisfy the respondent's obligations. *See e.g.*, *United States v. ASG Sols. Corp.*, No. 17CV1224 L (BGS), 2018 WL 1418023, at *5-6 (S.D. Cal. Mar. 22, 2018) (finding insufficient respondent's production of some responsive documents and ordering full compliance within 30 days); *Su v. Pamper Our Parents, Inc.*, No. 2:23-mc-03225 (NJC), 2024 WL 328807, at *2, *7 (E.D.N.Y. Jan. 29, 2024) (granting petition to enforce subpoena where respondent provided only "some documents" and ordering the remainder produced within 30 days). Subpoena recipients cannot stretch out compliance for months, "effectively avoiding disclosure and wasting government resources." *CFPB v. Educ. Credit Mgmt. Corp.*, No. 21-mc-00019 (SRN/DTS), 2022 WL 102275, at *5 n.10 (D. Minn. Jan. 11, 2022).

Nor is Cigna's lack of compliance excused because it also responded to the FTC's 6(b) order—issued 18 months before the CID—or because it is being sued by the FTC for separate conduct related to rebating practices. Large companies are regularly subjected to multiple investigations close in time or even in parallel. *See Texaco*, 555 F.2d at 881 (enforcing FTC subpoena notwithstanding concurrent Federal Power Commission ratemaking proceedings on related topics); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 585, 593-94 (D.C. Cir. 2001) (enforcing FTC subpoena "duplicative" of subpoenas in four previous investigations by the CFTC). And courts have frequently rejected arguments that a subpoena can be avoided because of an agency's previous requests for information. *See Carter*, 464 F. Supp. at 641 ("It is absolutely irrelevant that the FTC and other agencies have investigated and reported on [the subject of the

investigation] before."), *aff'd*, 636 F.2d 781 (D.C. Cir. 1980); *Petition of Borden Co.*, 75 F. Supp. 857, 863-64 (N.D. Ill. 1948) (enforcing two antitrust subpoenas notwithstanding "almost continuous investigation and prosecution by the Antitrust Division . . . at least three investigations [by the FTC]" and prior productions of approximately 50 tons of files); *Doe v. United States*, 253 F.3d 256, 272 (6th Cir. 2001) (no bad faith established by three DOJ subpoenas over two years); *cf. In re Archuleta*, 432 F. Supp. 583, 595 (S.D.N.Y. 1977) (rejecting argument that compliance with successive grand jury subpoenas would be unduly burdensome and oppressive).

## IV.    Cigna forfeited objections to the CID by failing to exhaust its administrative remedies

Cigna has forfeited any objections to the CID because it failed to exhaust its administrative remedies by petitioning the FTC to quash or modify the CID. A party must exhaust available administrative remedies before bringing its arguments to a court. *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006); *see also Morton Salt*, 338 U.S. at 653-54. Congress and the FTC have provided CID recipients with an administrative remedy to quash or narrow the CID's requests.15 U.S.C. § 57b-1(f); 16 C.F.R. § 2.10. Recipients must file such a petition with the FTC within 20 days of receiving the CID. *Id.* Filing a petition to quash is a "mandatory"—not "discretionary"—procedure that must be exhausted. *FTC v. GlaxoSmithKline*, 202 F.R.D. 8, 10 (D.D.C. 2001);[22] *see also Morton Salt*, 338 U.S. at 653-54 (inappropriate to consider whether Commission's order to produce reports exceeded its "investigatory power" where "[n]either

---

[22] Although the Commission has amended its rules of practice, including Rule 2.7, since the *GlaxoSmithKline* decision, the relevant language remains substantively the same. *Compare* 16 C.F.R. § 2.7(d) (2012) ("Any petition to limit or quash any investigational subpoena or civil investigative demand shall be filed with the Secretary of the Commission within twenty (20) days after service of the subpoena or civil investigative demand.") *with* 16 C.F.R. § 2.10(a)(1) ("Any petition to limit or quash any compulsory process shall be filed with the Secretary within 20 days after service of the Commission compulsory process or, if the return date is less than 20 days after service, prior to the return date.").

respondent raised objection to the order's sweep, nor asked for any modification, clarification, or interpretation of it").

Parties who do not seek to quash or modify an FTC subpoena forfeit the opportunity to later object to the subpoena. In *GlaxoSmithKline*, this Court held that the respondent could not assert privilege objections to the FTC's request for documents that had been ordered produced in a separate litigation because it had failed to file a petition to quash that request. 202 F.R.D. at 10. In *FTC v. Invention Submission Corp.*, this Court also disallowed relevance objections in an FTC subpoena enforcement action because the respondent had not raised them when it filed a petition to quash. Misc. No. 89-272 (RCL), 1991 WL 47104, at *1, *2 n.12 (D.D.C. Feb. 14, 1991). And in *FTC v. O'Connell Assoc., Inc.*, another district court explained that a CID recipient who failed to file a petition to quash could neither bring an action in federal court to challenge the CID, nor raise objections to it in an FTC enforcement proceeding. 828 F. Supp. 165, 168-69 (E.D.N.Y. 1993) (collecting cases). "In either case, there was an administrative mechanism for [the recipient] to utilize and he failed to do so." *Id.*[23]

The CID explicitly notified Cigna that the deadline to file a petition to narrow or quash is 20 days after receipt or prior to the return date for documents and information. *See* Pet. Ex. 2 at 1. Cigna never sought an extension of time to file a petition and did not file one. Goldenberg

---

[23] *See also FTC v. XCast Labs, Inc.*, No. Misc. 21-1026 MWF (MRWx), 2021 WL 6297885, at *3 (C.D. Cal. Dec. 9, 2021), *report and recommendation adopted*, No. Misc. 21-1026 MWF (MRWx), 2022 WL 60527 (C.D. Cal. Jan. 6, 2022) (FTC CID recipient "forfeited its ability to oppose enforcement" in federal court when it chose not to challenge the CID according to the prescribed administrative procedure); *FTC v. Complete Merch. Sols., LLC*, No. 2:19-cv-00996, 2020 WL 2059847, at *10, *12 (D. Utah Apr. 28, 2020) (because FTC CID recipient "failed to exhaust the applicable administrative remedies by raising its objections . . . in a petition to limit or quash," it "has waived any objections to the CID."); *FTC v. Tracers Info. Specialists, Inc.*, No. 8:16-MC-18TGW, 2016 WL 3896840, at *4 (M.D. Fla. June 10, 2016) (FTC CID recipient's "failure to comply with the administrative procedure provided by the statute and the implementing regulations bars its assertion of substantive objections to the CID in court").

Decl. ¶ 10. Having never filed a petition to narrow or quash, Cigna failed to exhaust its

administrative remedy and forfeited any objections to the CID.

**Conclusion**

For the reasons stated above, the FTC respectfully requests that the Court order Cigna to

show cause why it should not be ordered to complete document and data productions and certify

compliance within 30 days of the Court's order.

Dated: January 14, 2025                    Respectfully submitted,


                                           ANISHA S. DASGUPTA
                                           General Counsel

                                           MICHELE ARINGTON
                                           Assistant General Counsel for Litigation


                                           */s/ Lauren K. Peay*

                                           LAUREN K. PEAY (DC Bar No. 982275)
                                           DANIEL ALDRICH
                                           DANIEL W. BUTRYMOWICZ
                                           MICHAEL GOLDENBERG
                                           MAREN HANEBERG
                                           ALYSSA KARFINKEL
                                           THOMAS LA VOY
                                           SHANNON MANLEY
                                           RANDALL M. WEINSTEN
                                           LOGAN WILKE
                                           Attorneys
                                           Bureau of Competition Health Care Division

                                           FEDERAL TRADE COMMISSION
                                           600 Pennsylvania Ave., N.W.
                                           Washington, DC 20580
                                           (202) 326-3520
                                           lpeay@ftc.gov