# Exhibit 1

### DECLARATION OF MICHAEL GOLDENBERG
### PURSUANT TO 28 U.S.C. § 1746

I, Michael Goldenberg, hereby declare as follows:

1.      I am a United States citizen and I am over twenty-one years of age. I work as an attorney

for the U.S. Federal Trade Commission ("FTC" or "Commission") in Washington, D.C., in the

Health Care Division of the Bureau of Competition. I am assigned to the FTC's investigation

into potential anticompetitive conduct by the U.S.'s largest pharmacy benefit managers

("PBMs") (FTC File No. 2410005), which includes the civil investigative demand ("CID")

issued to Respondent the Cigna Group ("Cigna" or "Respondent") on December 8, 2023.

2.      I am authorized to execute a declaration verifying the facts that are set forth in the

Petition to Enforce Civil Investigative Demand. I have read this petition and the attached exhibits

and confirm that the exhibits are true and correct copies of the original documents or are excerpts

of the true and correct copies. The facts set forth in this declaration are based on my personal

knowledge or information that I have learned during the FTC's investigation.

3.      Cigna is a healthcare conglomerate and the parent company of Express Scripts, Inc.

("Express Scripts"), one of the three largest PBMs in the U.S. Express Scripts owns the largest

mail order pharmacy in the United States, Express Scripts Pharmacy, and the second largest

specialty pharmacy in the United States, Accredo, which it purchased in April 2012.

4.      Cigna has its principal place of business at 900 Cottage Grove Road, Bloomfield,

Connecticut, and Express Scripts has its principal place of business at One Express Way, Saint

Louis, Missouri. Both Cigna and Express Scripts transact business throughout the U.S., including

in the District of Columbia.

5.      The FTC initiated this investigation in fall 2023 following numerous complaints from

pharmacies, patients, and other market participants of potentially anticompetitive practices,

including imposing oppressive terms and fees on unaffiliated pharmacies—those not owned by Cigna—through take-it-or-leave-it contracts required to join Cigna's pharmacy networks; incentivizing or requiring beneficiaries to fill prescriptions at Cigna's own affiliated pharmacies; and targeting unaffiliated pharmacies with pretextual audits.

6.      The investigation seeks to determine whether any pharmacy-related conduct by Cigna or the conglomerates operating the other two largest PBMs violates any of the laws enforced by the FTC. To answer this question, Staff needs to understand Cigna's power in the markets for PBM and pharmacy services; the relationship between Cigna's PBM and pharmacy businesses; Cigna's pharmacy-network contracting practices and terms; and whether, how, and why Cigna steers prescriptions to Cigna-affiliated pharmacies.

7.      To aid in this investigation, the Commission issued a CID to Cigna on December 8, 2023, pursuant to FTC Resolution P210100. The CID was signed pursuant to Section 2.7(a) of the FTC's Rules of Practice. 16 C.F.R. § 2.7(a). The FTC served Cigna a courtesy copy of the CID via email on December 8, 2023, and formally served Cigna via expedited delivery service on December 13, 2023. The CID set January 8, 2024, as the deadline for Cigna to comply.

8.      The CID specifications require Cigna to produce documents, data, and narrative responses that will assist Staff in determining whether Cigna's business practices in the PBM and pharmacy services industries violate any of the laws enforced by the FTC. In particular, it seeks information relating to: (a) Cigna's corporate structure and finances (Specifications 1-7); (b) executive discussions of pharmacy services and pharmacy benefit management services (Specification 8-12); (c) data related to pharmacy services and pharmacy benefit management services (Specifications 13-18); (d) fees and payments made to pharmacies and other similar entities (Specifications 19-24); (e) how Cigna builds pharmacy networks, including its

contracting practices with and evaluation of participating pharmacies (Specifications 25-31);

(f) pharmacy audits (Specification 32); (g) completed or contemplated transactions relating to

pharmacy services (Specification 33); (h) Cigna's use of and relationships with specialty and

mail order pharmacies, including Cigna's efforts to require or encourage patients to use its

affiliated pharmacies (Specifications 34-39); and (i) Cigna's corporate practices for document

preservation and process for complying with the CID (Specifications 40-43).

9.      The CID also informed Cigna that it must file any petition to limit or quash the CID

within 20 days after service and certify that its responses are complete by completing the Form

of Certificate of Compliance set forth on the back of the CID form or by signing a declaration

under penalty of perjury pursuant to 28 U.S.C. § 1746. Pet. Ex. 2 at 1-2.

10.     Cigna did not petition the Commission to quash or limit the scope of the CID under the

procedure outlined in Rule 2.10 of the FTC's Rules of Practice. 16 C.F.R. § 2.10. The deadline to

move to quash or limit the scope passed on December 28, 2023, and Cigna did not request an

extension.

11.     Health Care's PBM investigation is separate and distinct from a market study of the PBM

industry that the Commission authorized staff from the Office of Policy Planning (OPP) to

conduct in June 2022. That study is pursuant to Section 6(b) of the FTC Act, which allows the

FTC to study an industry and its market dynamics. 15 U.S.C. § 46(b). The Commission issued an

order ("6(b) Order") to Express Scripts on June 6, 2022, seeking information to further that

study.

12.     By statute, the 6(b) Order does not seek documents or data created after the date the order

was issued. Moreover, the 6(b) Order only seeks materials in possession, custody, or control of

Express Scripts, Cigna's PBM subsidiary, and not materials possessed by its parent Cigna or by

any other Cigna affiliates or subsidiaries to which Express Scripts does not itself have access.

The 6(b) Order also sought information on numerous subjects not required by the CID, such as

documents and data relating to formulary management and manufacturer rebate contracting.

13.     Whereas the 6(b) Order only solicited responsive materials through June 6, 2022, the

CID requires Cigna to produce responsive materials through "30 days before the date on which

the company provides the Commission with its final document submission [and] the executed

certification form." Pet. Ex. 2 at 18 (Instruction I 2). The certification form requires Cigna to

attest that Cigna has identified all responsive information in its possession, custody, or control

and that it has either provided such information to the FTC or, "for any responsive information

not provided, given the FTC written objections setting forth the basis for withholding the

responsive information." Pet. Ex. 2 at 28. In addition, the CID seeks information on numerous

subjects not covered by the 6(b) Order. To the extent that the requested information in the 6(b)

Order and CID overlap, however, FTC Staff sought to minimize the burden on Cigna of

complying with the CID by allowing Cigna to simply re-produce or identify as responsive the

documents it had already produced in response to the 6(b) Order.

14.     As described in more detail in the paragraphs that follow, over the 13 months since the

CID was issued, Cigna has continuously delayed its compliance with the CID. In the first nine

months, Cigna did not produce any documents unique to this investigation other than

organizational charts. To date, Cigna has produced fewer than 20,000 documents unique to this

investigation, despite having committed to complete its document productions by the end of

October 2024 and has refused to provide Staff with information about its progress, such as the

number of documents it has reviewed, and the number of documents it has left to review. After a

news article earlier today publicly leaked the Commission's intent to file this action, Cigna sent

an email stating it that it would soon make unspecified additional document productions—its first since November 15, 2024.

15.    Across two meet and confers with Cigna in December 2023 and early January 2024, Staff requested Cigna's initial custodial proposal, search term proposal, and proposed production timeline. Staff was clear that it would need custodians outside of the list used for the 6(b) Order, which was limited to a small number of senior executives. For example, the custodians in the 6(b) Order included the two executives in charge of Express Scripts' mail order and specialty pharmacies but none of the employees who reported to them.

16.    On January 9, 2024, Cigna produced four pages of organizational charts. On January 17, 2024, Cigna produced 11 additional pages of organizational charts.

17.    The CID's original deadline to comply was January 8, 2024. Based on Cigna's commitments to produce those organizational charts, the FTC extended Cigna's deadline to comply with the CID to February 8, 2024. The FTC explained to Cigna that any request for further extension would be carefully considered based upon Cigna's substantial compliance with the CID. Cigna did not produce or commit to produce any additional materials by the February 8 deadline and did not otherwise make progress towards complying with the CID. Cigna did not request or receive another extension, and it has been out of compliance with the CID since February 9, 2024.

18.    On February 1, 2024, Cigna proposed a custodian list of only eight employees, all of whom were also 6(b) custodians, and a date range of January 1, 2017 to June 6, 2022, the same as for the 6(b) study. Further, Cigna proposed searching four of the eight proposed custodians

only for materials responsive to 13 specifications and the other four custodians only for materials responsive to five specifications.

19.    During two meet and confers in February 2024, Cigna described relevant roles and responsibilities of employees who were not designated as custodians for the 6(b) Order. At the second February meet and confer, Staff reiterated that the CID required documents and information from custodians outside of the list used for the 6(b) Order. Following these meet and confers, Staff asked for basic additional information to guide its custodial negotiations, such as the number of employees reporting to certain potential custodians. In five emails over the next six weeks—until early April—Cigna repeatedly insisted that it was working on the requests but did not provide the information.

20.    On March 15, 2024, for the sake of efficiency, Staff identified 21 custodians whose materials appeared necessary for Cigna to adequately respond to the CID, reserving the right to revise the list upon the receipt of the information it sought. Cigna had already produced documents for nine of these 21 custodians in connection with the 6(b) Order. On March 25, Staff spent an hour explaining to Cigna why each of the proposed custodians was likely to have responsive documents in their files.

21.    On April 5, 2024, Cigna categorically refused to produce documents for *any* Cigna employees who were not custodians in the 6(b) Order, without providing any reason why Staff's other 12 proposed custodians would not have responsive documents or why collecting their documents would impose any particular burden for Cigna. Cigna had not communicated that it planned to take this position in any of its prior emails or meetings with Staff. At this time, four months after the CID was issued, Cigna still had not produced any materials specific to this investigation other than organizational charts. On April 19, Staff reiterated to Cigna that the CID

required additional information distinct from the 6(b) Order for law enforcement purposes, and informed Cigna that it would file an enforcement action if Cigna did not commit to producing the responsive documents for the relevant time period from all 21 identified custodians.

22.    It was not until May 29, 2024—after six additional weeks of back-and-forth—that Cigna agreed to an expanded list of custodians. Even then, Cigna agreed to only 17 of the custodians on Staff's proposed list: the nine custodians for whom it had already produced documents in the 6(b) Order and eight additional custodians. On the same day, Cigna agreed to submit its search term proposal, which Staff initially had asked for in January.

23.    By June 20, 2024, Cigna had still not sent a search term proposal, so FTC Staff sent its own proposed search terms in the interest of efficiency. Staff requested that Cigna provide hit counts for the terms, so that Staff could work together with Cigna to balance any burden against utility.

24.    Cigna again did not respond, this time for over a month. For example, on July 5, Staff sent an email asking Cigna for its availability to discuss Staff's proposed search terms, but received no response.

25.    In late July 2024, Staff offered to further narrow its proposed search terms and the agreed-upon custodian list. Staff's revised search term list narrowed certain strings and eliminated others entirely. Its revised custodian list deferred three custodians, reducing the total to 14. For eight of those custodians, Staff had already offered to accept Cigna's previously produced 6(b) Order documents, meaning that Cigna would only need to search their documents from June 2022 to present. Thus, under Staff's new proposal, Cigna would only need to search the documents of six custodians for the CID's full relevant time period. Staff was not obligated to make these concessions, but offered them in good faith in order to move negotiations forward

and prevent further delay. Staff explained that, in exchange for these deferrals, it expected Cigna to produce data by September 6 and documents by October 10.

26.     On August 9, 2024, Cigna agreed to the narrower list of custodians and proposed to further narrow search terms. Cigna did not provide hit counts for those narrowed terms or proffer a rationale for each of the revisions they proposed. Further, Cigna did not agree to Staff's production timeline. Cigna stated in a letter that it hoped to end by early December but may need to adjust that timeline even further.

27.     On August 12, 2024, Staff communicated to Cigna its serious concerns with Cigna's failure to make meaningful progress towards complying with the CID and explained that it would recommend a CID enforcement action if Cigna was not willing to commit to a reasonable timeline to comply. At the time, in the eight months since the CID was issued, Cigna had produced no documents or data beyond what it had already produced in response to the 6(b) Order and some organizational charts.

28.     On August 16, 2024, Cigna proposed a production schedule, with document productions complete by October 31 and data productions complete by November 15.  Although Cigna's proposed timeline set production deadlines one to two months later than Staff's proposal, Staff nonetheless agreed and accepted Cigna's narrower set of search terms, in an effort to finally receive substantive productions on a concrete timeline.

29.     Cigna did not meet its own deadlines.[1] As of October 31, 2024, when Cigna's document productions should have been complete, Cigna had produced fewer than 15,000 custodial

---

[1] Although Cigna met most of the data production deadlines in its August agreement with Staff, Staff notes that Cigna in February stated that it intended to produce all data responsive to the CID by May 2024. Cigna did not produce the data until November. In addition, Cigna still has not produced any of the data on non-commercial payor types required by Specification 13, and has not produced data on specialty networks, despite telling the FTC that it intended to do so in November.

documents. Cigna did not inform Staff that it would miss the deadline until six days prior on October 25. Cigna then repeatedly refused to answer Staff's questions about its progress toward completion. Since then, Cigna has made only one document production, of approximately 4,500 documents, on November 15. After news of the Commission's intent to file this action became public earlier today, Cigna claimed that it would make additional unspecified productions.

30.    After inquiries from Staff on October 29, November 4, and November 14, 2024, Cigna stated on November 21 that it then expected to complete document productions by December 31, 2024. Again, Cigna did not meet this deadline. In fact, since making that commitment, Cigna did not produce a single additional document, and only stated that it would produce additional documents when public reports of this very filing surfaced. Cigna has provided no explanation for this failure.

31.    As of January 13, 2025, Cigna had produced approximately 19,000 documents uniquely responsive to this CID, which Staff believes is a small fraction of the total, as in July Cigna estimated that Staff's proposed search terms returned 1.6 million documents. Cigna has repeatedly missed its production deadlines without explanation and refused to identify how many documents it has reviewed and how many documents it has left to review.

32.    On January 14, 2025, as Staff was finalizing this petition for filing, Bloomberg released a news article leaking the Commission's plan to bring an enforcement action against Cigna that day. Within hours, Cigna emailed Staff stating that it intended to make unspecified additional document productions. Prior to this communication, Cigna had not made a document production in nearly two months, since November 15; had not provided answers to any of Staff's emails asking for updates on Cigna's progress; and had bypassed its December 31 document production deadline without comment or explanation. This last-minute production spurred by the

Commission's planned enforcement action does not give Staff confidence that Cigna will now make good on any future promises.

33.    Apart from a single boilerplate objection, Cigna has not made any relevance objections to the CID. Nor has Cigna substantiated any claim of undue burden to comply with its outstanding obligations, especially in light of Staff's numerous concessions.

34.    Given Cigna's year of delays, repeated failures to meet negotiated deadlines, and lack of any production since November 2024, FTC staff cannot rely on any Cigna representation for future compliance with the CID without judicial intervention. Cigna's failure to comply with the CID has prevented the Commission from completing its investigation in a timely manner, has burdened the Commission's scarce public resources, and is significantly hindering the Commission's ability to carry out its investigation into whether Cigna's business practices violate the law.

35.    I declare under penalty of perjury that the foregoing is true and correct.


Executed on: January 14, 2025                    */s/ Michael Goldenberg*__
                                                 Michael Goldenberg
                                                 Attorney
                                                 Health Care Division
                                                 Bureau of Competition
                                                 Federal Trade Commission

# Exhibit 2

United States of America
Federal Trade Commission

# CIVIL INVESTIGATIVE DEMAND

| 1. TO | | 1a. MATTER NUMBER |
|---|---|---|
| Cigna Corporation<br>c/o Nicole Jones<br>Executive Vice President and General Counsel<br>900 Cottage Grove Road<br>Bloomfield, CT 06002 | | FTC File No. 2410005 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

## 2. ACTION REQUIRED

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | |
| | DATE AND TIME OF HEARING OR DEPOSITION |
| | |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule.  Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

January 8, 2024 by 5:00 pm ET

## 3. SUBJECT OF INVESTIGATION

Whether conduct by Cigna Corporation violates Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended; and whether Commission action to obtain injunctive relief would be in the public interest. See also attached resolution.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Kara Monahan, Records Custodian<br>Nicholas Leefer, Deputy Records Custodian | Nicholas Leefer, Amanda Triplett, Alpa Davis, Evan Cartagena, Michael Goldenberg, Logan Wilke |

| DATE ISSUED<br>12/08/2023 | COMMISSIONER'S SIGNATURE<br>*Lisa Khan* |
|---|---|

## INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

## YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

FTC Form **144** (rev 11/17)

# Form of Certificate of Compliance*

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____  _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## CIVIL INVESTIGATIVE DEMAND
## ISSUED TO CIGNA CORPORATION
## FTC FILE NO. 2410005

Unless modified by agreement with the staff of the Federal Trade Commission (the "Commission" or the "FTC"), each Specification of this Civil Investigative Demand ("CID") requires a complete search of the company as defined in the Definitions, which appear after the following Specifications. Pursuant to the Commission's Rules of Practice, 16 C.F.R. § 2.7(k), company representatives must confer with the Commission representative identified in the final instruction of this CID within fourteen days after receipt of this CID. If the company believes that the required search or any other part of this CID can be narrowed in any way that is consistent with the Commission's need for information, you are encouraged to discuss such questions and possible modifications with the Commission representative. All modifications to this CID must be agreed to in writing pursuant to the Commission's Rules of Practice, 16 C.F.R. § 2.7(l).

## SPECIFICATIONS

For the period of January 1, 2017 to present, please provide the following:

### I.    Organizational Information

1.    Identify the Company's subsidiaries, parent companies, any other affiliated business entities, agents, and consultants that have, or had, any financial interest in or responsibility for PBM Services.

2.    Identify the Company's subsidiaries, parent companies, any other affiliated business entities, agents, and consultants that have, or had, any financial interest in or responsibility for Pharmacy Services.

3.    For each of the Company's subsidiaries, parent companies, other affiliated business entities, agents, and consultants that have, or had, any financial interest in or responsibility for PBM Services, identify the following:

   a)    The interest in or responsibility relating to PBM Services;

   b)    The ownership type and structure (e.g., corporation, LLC, etc.);

   c)    Where the entity is incorporated or otherwise registered;

   d)    The location(s) of the entity's offices and other facilities; and

   e)    The business(es) in which the entity is engaged.

   Submit and identify by Bates number documents sufficient to support your response.

4.    For each of the Company's subsidiaries, parent companies, other affiliated business entities, agents, and consultants that have, or had, any financial interest in or responsibility for Pharmacy Services, identify the following:

a)   The interest in or responsibility relating to Pharmacy Services;

b)   The ownership type and structure (e.g., corporation, LLC, etc.);

c)   Where the entity is incorporated or otherwise registered;

d)   The location(s) of the entity's offices and other facilities; and

e)   The business(es) in which the entity is engaged.

Submit and identify by Bates number documents sufficient to support your response.

5.    Submit one copy of each organizational chart and personnel directory for the Company as a whole (including domestic and international entities) and for each of the Company's divisions or business segments involved, directly or indirectly, in any activity relating to (a) PBM Services and (b) Pharmacy Services.

6.    Submit a list of all agents, representatives, and intermediaries acting on behalf of the Company, including but not limited to, all consultants, product distributors, sales agents, and other Persons involved in any capacity relating to PBM Services.

For each agent, representative, or intermediary identified in response to this Specification, include their title, a description of their role and reporting structure, and a description of any records, documents, or data maintained by that agent, representative, or intermediary relating to PBM Services.

7.    Provide each financial statement, budget, profit and loss statement, cost center report, performance report, forecast, and any other financial or operational report regularly prepared by or for the Company on a periodic basis, including but not limited to reports for the Company as a whole and for each of the Company's divisions or business segments involved in (a) PBM Services and (b) Pharmacy Services.

8.    Provide a list of members of the Company's board of directors or board of trustees, including each member's name, address, occupation, and period of service.

9.    Submit one copy of all meeting minutes and related presentations to the Company's board of directors or board of trustees relating to PBM Services.

10.   Submit one copy of all meeting minutes and related presentations to the Company's board of directors or board of trustees relating to Pharmacy Services.

11.   Submit one copy of all meeting minutes and related presentations to meetings of the Company's senior executives relating to PBM Services.

12.   Submit one copy of all meeting minutes and related presentations to meetings of the Company's senior executives relating to Pharmacy Services.

## II.    Payments to and from Relevant Entities, Including DIR Fees and Reimbursement

13.    For each year, provide the following data for each Relevant Entity, including:

a)    Pharmacy Name;

b)    NCPDP Provider ID;

c)    Whether the Relevant Entity is Company-owned or affiliated;

d)    Whether the Relevant Entity uses pharmacy services administrative organizations (PSAOs) and if so, which ones are used;

e)    Whether the Relevant Entity is a Retail Pharmacy, Chain Pharmacy, Specialty Pharmacy, Independent Pharmacy, Mail-Order Pharmacy or other type of pharmacy;

f)    Address of Relevant Entity, (including zip code and latitude and longitude); and

g)    By payer type (Commercial, Medicare, Medicaid, other), and separately for Non-Specialty Brand, Non-Specialty Generic, Specialty Brand, and Specialty Generic drugs, provide:

    i.    Total 30-Day Equivalent Prescriptions;

    ii.    Total AWP;

    iii.    Total WAC;

    iv.    Total payment to the Relevant Entity for Prescriptions, including patient copays or co-insurance, reimbursement and dispensing fees, and any other payments; and

    v.    Total Post-Sale Adjustments, listing separately the totals for each type of adjustment (e.g., DIR Fees, generic dispense rate, brand effective rate, generic effective rate, medication adherence, medication therapy management, high-risk medications, etc.).

14.    For each year, provide the following information for each Pharmacy Network:

a)    Pharmacy Network Name;

b)    Network ID;

c)    Number of lives or beneficiaries associated with the network;

d)    Network type (e.g., open, preferred, limited);

e)    Number of pharmacy locations included in the network; and

f)   Separately for Non-Specialty Brand, Non-Specialty Generic, Specialty Brand, and Specialty Generic drugs, provide:

    i.   Total 30-Day Equivalent Prescriptions;

    ii.   Total AWP;

    iii.   Total WAC;

    iv.   Total payment to Relevant Entities for Prescriptions, including patient copays or co-insurance, reimbursement and dispensing fees, and any other payments;

    v.   Any terms, metrics, or criteria used to calculate each type of payment to the Relevant Entities in the Pharmacy Network;

    vi.   Total Post-Sale Adjustments, listing separately the totals for each type of adjustment (e.g., DIR Fees, generic dispense rate, brand effective rate, generic effective rate, medication adherence, medication therapy management, high-risk medications, etc.); and

    vii.   Any terms, metrics or criteria used to calculate each type of Post-Sale Adjustment.

15.   For each year, provide the following information for each Relevant Entity within each Pharmacy Network:

a)   Pharmacy Network Name;

b)   Network ID;

c)   Pharmacy Name;

d)   NCPDP Provider ID;

e)   Network status (e.g., Preferred Pharmacy status); and

f)   Separately for Non-Specialty Brand, Non-Specialty Generic, Specialty Brand, and Specialty Generic drugs, provide:

    i.   Total 30-Day Equivalent Prescriptions;

    ii.   Total AWP;

    iii.   Total WAC;

    iv.   Total payment to the Relevant Entity, including patient copays or co-insurance, reimbursement and dispensing fees, and any other payments;

v.   Any terms, metrics, or criteria used to calculate each type of payment to the Relevant Entity;

vi.  Total Post-Sale Adjustments, listing separately the totals for each type of adjustment (e.g., DIR Fees, generic dispense rate, brand effective rate, generic effective rate, medication adherence, medication therapy management, high-risk medications, etc.); and

vii. Any terms, metrics or criteria used to calculate each type of Post-Sale Adjustment.

16.   For each year, provide the following annual pharmacy reimbursement data for each Relevant Entity reimbursed by the Company for each of the top 100 drugs by annual Total Amount Paid to all Relevant Entities by the Company:

a)   Drug name (including all doses and dosage forms);

b)   NDC(s);

c)   Pharmacy Name;

d)   NCPDP Provider ID;

e)   Payer Type (Commercial, Medicare, Medicaid, or All Other);

f)   Quantity Dispensed;

g)   Number of 30-Day Equivalent Prescriptions;

h)   Total Amount Paid (to Relevant Entity);

i)   Ingredient Cost Paid (to Relevant Entity);

j)   Dispensing Fee Paid (to Relevant Entity);

k)   Incentive Amount Paid (to Relevant Entity);

l)   Other Amount Paid (to Relevant Entity);

m)  Flat Sales Tax Amount Paid (to Relevant Entity);

n)   Percentage Sales Tax Amount Paid (to Relevant Entity);

o)   Patient Pay Amount (to Relevant Entity);

p)   Other Payer Amount Recognized (to the Relevant Entity);

q)   Total amount billed to Plan Sponsor;

r)   Total acquisition cost of drug product dispensed (provide only for each Relevant Entity owned or otherwise affiliated with the Company);

s)   Spread Price Amount retained by the Company; and

t)   Post-Sale Adjustments attributed to this drug product, listing separately the totals for each type of adjustment.

17.   For each year, provide the following annual pharmacy reimbursement data for each Relevant Entity reimbursed by the Company for each of the top 100 drugs by annual total number of 30-day equivalent prescriptions at all Relevant Entities:

a)   Drug name (including all doses and dosage forms);

b)   NDC(s);

c)   Pharmacy Name;

d)   NCPDP Provider ID;

e)   Payer Type (Commercial, Medicare, Medicaid, or All Other);

f)   Quantity Dispensed;

g)   Number of 30-Day Equivalent Prescriptions;

h)   Total Amount Paid (to Relevant Entity);

i)   Ingredient Cost Paid (to Relevant Entity);

j)   Dispensing Fee Paid (to Relevant Entity);

k)   Incentive Amount Paid (to Relevant Entity);

l)   Other Amount Paid (to Relevant Entity);

m)  Flat Sales Tax Amount Paid (to Relevant Entity);

n)   Percentage Sales Tax Amount Paid (to Relevant Entity):

o)   Patient Pay Amount (to Relevant Entity);

p)   Other Payer Amount Recognized (to Relevant Entity);

q)   Total amount billed to Plan Sponsor;

r)   Total acquisition cost of drug product dispensed (provide only for each Relevant Entity owned or otherwise affiliated with the Company);

s)    Spread Price Amount retained by the Company; and

t)    Post-Sale Adjustments attributed to this drug product, listing separately the totals for each type of adjustment.

18.    For each year, provide the following annual pharmacy reimbursement data for each Relevant Entity reimbursed by the Company for each drug on the Company's Specialty Drug List:

a)    Drug name (including all doses and dosage forms);

b)    NDC(s);

c)    Pharmacy Name;

d)    NCPDP Provider ID;

e)    Payer Type (Commercial, Medicare, Medicaid, or All Other);

f)    Quantity Dispensed;

g)    Number of 30-Day Equivalent Prescriptions;

h)    Total Amount Paid (to Relevant Entity);

i)    Ingredient Cost Paid (to Relevant Entity);

j)    Dispensing Fee Paid (to Relevant Entity);

k)    Incentive Amount Paid (to Relevant Entity);

l)    Other Amount Paid (to Relevant Entity);

m)    Flat Sales Tax Amount Paid (to Relevant Entity);

n)    Percentage Sales Tax Amount Paid (to Relevant Entity):

o)    Patient Pay Amount (to Relevant Entity);

p)    Other Payer Amount Recognized (to Relevant Entity);

q)    Total amount billed to Plan Sponsor;

r)    Total acquisition cost of drug product dispensed (provide only for each Relevant Entity owned or otherwise affiliated with the Company);

s)    Spread Price Amount retained by the Company; and

    t)  Post-Sale Adjustments attributed to these drug products, listing separately the totals for each type of adjustment.

19.    Submit all documents relating to DIR Fees paid by or to Relevant Entities, including but not limited to related performance or quality metrics for Relevant Entities.

20.    Submit all documents relating to Post-Sale Adjustments not encompassed in Specification 19 related to the dispensing of prescription drugs or the provision of Pharmacy Services.

21.    Submit all documents relating to reimbursements and other payments to each Relevant Entity related to the dispensing of prescription drugs or the provision of Pharmacy Services.

22.    Submit all documents relating to the Company's strategies or plans relating to DIR Fees, Post-Sale Adjustments, and reimbursements, including but not limited to any changes the Company has made or plans to make.

23.    Submit all documents relating to the final CMS rule published in the Federal Register on May 9, 2022 (87 Fed. Reg. 27704 through 27902), adopting a new definition of "negotiated price" at 42 CFR §432.100, including but not limited to documents discussing the Company's plans to comply with the rule, reimbursement rates, and any other contract terms offered to Relevant Entities for Medicare Part D drugs.

24.    Submit all communications relating to DIR Fees, Post-Sale Adjustments, or reimbursements with trade associations, PBMs, and any agents or consultants that determine or provide input on DIR Fees, Post-Sale Adjustments, or reimbursements.

### III.    Pharmacy Network Participation

25.    One copy of each of the Company's contracts (including all addenda, amendments, or modifications) with Relevant Entities relating to (a) PBM Services and (b) Pharmacy Services.

26.    One copy of each of the Company's provider manuals applicable to Relevant Entities.

27.    Submit all documents relating to rules or requirements for Pharmacy Network participation, or Preferred Pharmacy status, and any participation limits, fees, or restrictions for Relevant Entities.

28.    Submit all documents relating to all Relevant Entities that were denied or terminated from participation, rejected an offer to participate, or were denied the opportunity to discuss participation in the Company's Pharmacy Network, including as a Preferred Pharmacy.

29.    Submit all documents relating to the assessment of quality, cost, or performance of each of the Relevant Entities.

30.     Submit all documents relating to Pharmacy Network participation, including but not limited to communications with Relevant Entities and decisions regarding Pharmacy Network participation and Preferred Pharmacy status.

31.     Submit all documents relating to Pharmacy Network design, strategic plans, and assessments of the Company's comparative performance with any other company.

### IV.     Audits and Transactions Involving Pharmacies

32.     Submit all documents relating to audits of Relevant Entities.

33.     Identify any Transaction involving a Relevant Entity contemplated, evaluated, discussed, planned, considered, or completed by the Company and submit all documents relating to any such Transaction.

### V.     Specialty, Mail-Order, and Affiliated Pharmacies

34.     Submit all documents relating to the Company's policies and criteria for defining, designating, categorizing, or treating drugs as Specialty Drugs.

35.     For each quarter, provide a list of all drugs defined or designated as Specialty Drugs on any formulary administered by the Company and identify whether each such drug has been designated as Brand or Generic.

36.     Submit all documents relating to any efforts to require, direct, encourage, or incentivize patients to utilize Specialty or Mail-Order Pharmacy, including those owned or affiliated with the Company. Such efforts could include but are not limited to co-pay differentials, availability of 90-day refills, shipping charge differentials, pricing differentials, express shipping availability, simplified ordering, patient communication or reminder policies, or other service or any other financial or non-financial incentives.

37.     Submit all documents relating to any efforts to require, direct, encourage, or incentivize patients to utilize a Retail Pharmacy owned or affiliated with the Company. Such efforts could include but are not limited to co-pay differentials, availability of 90-day refills, shipping charge differentials, pricing differentials, express shipping availability, simplified ordering, patient communication or reminder policies, or other service or any other financial or non-financial incentives.

38.     Submit all of the Company's contracts (including all addenda, amendments, or modifications) or policies regarding internal transfer pricing by the Company and any Relevant Entity owned by or affiliated with the Company.

39.     Submit all documents relating to policies and criteria for defining, designating, categorizing, or treating drugs as Specialty Drugs with trade associations, PBMs, and any agents or consultants that determine or provide input on the policies and criteria for defining, designating, categorizing, or treating drugs as Specialty Drugs.

9

## VI.    Miscellaneous

40.    Submit documents sufficient to show and, to the extent not reflected in such documents, describe in detail the Company's policies and procedures relating to the retention and destruction of documents and data.

41.    Submit documents sufficient to show, and to the extent not reflected in such documents, describe in detail the Company's policies and procedures relating to keeping non-public information regarding Relevant Entities obtained in the course of delivering PBM Services separate from subsidiaries or affiliated business engaged in the delivery of Pharmacy Services.

42.    Submit all information described in Instructions below, and any additional instructions necessary for the Commission to use or interpret the data and information submitted in response to this CID.

43.    Submit the name(s) and title(s) of the person(s) responsible for preparing the response to this CID and a copy of all instructions prepared by the Company relating to the steps taken to respond to this CID. Where oral instructions were given, identify the individual who gave the instructions and describe the content of the instructions and the person(s) to whom the instructions were given.

## DEFINITIONS

1.    The terms "and" and "or" have both conjunctive and disjunctive meanings.

2.    The term "AWP" means average wholesale price.

3.    The term "Brand" or "Brand Drug" means a drug approved by the FDA under a New Drug Application (NDA) or Biologic License Application (BLA).

4.    The terms "Chain" and "Chain Pharmacy" means any business entity that owns four or more pharmacy locations nationwide, either under a single banner or multiple banners, and any individual pharmacy locations within such business entity.

5.    The term "Communication" means any exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished.

6.    The term "the Company" or "Company" means Cigna Corporation, its domestic and foreign parents, predecessors, subsidiaries, affiliates, partnerships, and joint ventures, and all directors, officers, principals, employees, agents, and representatives of the foregoing.

7.    The term "computer files" includes information stored in, or accessible through, computer or other information retrieval systems. Thus, the Company should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, mobile devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of

offline storage, whether on or off Company premises. If the Company believes that the required search of backup disks and tapes and archive disks and tapes can be narrowed in any way that is consistent with the Commission's need for documents and information, you are encouraged to discuss a possible modification to this Definition with the Commission representatives identified on the last page of this Request. The Commission representative will consider modifying this Definition to:

a)  exclude the search and production of files from backup disks and tapes and archive disks and tapes unless it appears that files are missing from files that exist in personal computers, portable computers, workstations, minicomputers, mainframes, and servers searched by the Company;

b)  limit the portion of backup disks and tapes and archive disks and tapes that needs to be searched and produced to certain key individuals, or certain time periods or certain Specifications identified by Commission representatives; or

c)  include other proposals consistent with Commission policy and the facts of the case.

d)  The term "Person" includes the Company and means any natural person, corporate entity, partnership, association, joint venture, government entity, or trust.

8.  The term "DIR Fee" means all direct and indirect remuneration fees and price concessions or adjustments that impact prescription drug costs that are not captured at the point of sale.

9.  The term "Dispensing Fee Paid (to Relevant Entity)" refers to the amount reported as paid to the pharmacy in NCPDP Field #507-F7.

10.  The term "documents" means any information, on paper or in electronic format, including written, recorded, and graphic materials of every kind, in the possession, custody, or control of the Company. (However, your response as it relates to separately incorporated subsidiaries or affiliates should only include information from or about such entities if you already have access to it, including information maintained in a central data repository. You should not otherwise seek any responsive information from separately incorporated subsidiaries or affiliates.) The term "documents" includes, without limitation: computer files; email messages; audio files; text messages, instant messages; drafts of documents; metadata and other bibliographic or historical data describing or relating to documents created, revised, or distributed electronically; copies of documents that are not identical duplicates of the originals in that Person's files; and copies of documents the originals of which are not in the possession, custody, or control of the Company.

11.  Unless otherwise specified, the term "documents" excludes:

a)  bills of lading, invoices, purchase orders, customs declarations, and other similar documents of a purely transactional nature;

b)  architectural plans and engineering blueprints;

11

    c) documents solely relating to environmental, tax, OSHA, or ERISA issues; and

    d) relational and enterprise databases, except as required to comply with an individual Specification.

12. The term "drug" includes all "small molecule" drugs and biological products approved by the U.S. Food & Drug Administration (FDA).

13. The term "Flat Sales Tax Amount Paid (to Relevant Entity)" refers to the amount reported as paid to the pharmacy in NCPDP Field #558-AW.

14. The term "formulary" means any list of prescription drugs that describes the circumstances under which the Company will reimburse particular drug products.

15. The term "Generic" or "Generic Drug" means any FDA-approved drug that was approved based on bioequivalence or biosimilarity to a preexisting drug product, including any authorized generic products.

16. The term "Incentive Amount Paid (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #521-FL.

17. The term "Independent Pharmacy" means any business entity that owns less than four pharmacy locations nationwide, either under a single banner or multiple banners, and any individual pharmacy locations within such business entity.

18. The term "Ingredient Cost Paid (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #506-F6.

19. The term "Mail Order Pharmacy" means any pharmacy that primarily dispenses prescription drugs to patients or patients' designees via the United States Postal Service, a common carrier, or a delivery service. The term does not include Specialty Pharmacies.

20. The term "NDC" means the National Drug Code.

21. The term "Other Amount Paid (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #565-J4.

22. The term "Other Payer Amount Recognized (to the Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #566-J5.

23. The term "Patient Pay Amount (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #505-F5.

24. The term "Pharmacy Services" means services related to home delivery services or mail-order pharmacy services, retail pharmacy services, Specialty Pharmacy, community health pharmacy services.

25.     The term "PBM Services" means all services related to the creation, operation, and administration of Pharmacy Networks to fulfill and reimburse prescriptions for beneficiaries of a Pharmacy Benefits Plan. These services include but are not limited to the negotiation and determination of reimbursement amounts, payments, fees, performance metrics or criteria, and terms of service or network participation for Relevant Entities.

26.     The term "Percentage Sales Tax Amount Paid (to Relevant Entity)" means the amount reported as paid to the pharmacy in NCPDP Field #559-AX.

27.     The term "Pharmacy Benefits Plan" or capitalized "Plan" means any pharmacy benefit product issued, administered, or serviced by the Company under which covered individuals are entitled to any reimbursement for prescribed Drugs. For clarification, a Plan may include commercial, capitated Medicaid, capitated Medicare, or qualified health plans with coverage for prescription drugs under an open, closed, or multi-tiered formulary.

28.     The term "Pharmacy Network" means a collection of Relevant Entities that beneficiaries within a Pharmacy Benefits Plan are required or incentivized to use to obtain reimbursement for the costs of prescription drugs.

29.     The uncapitalized term "plan" means tentative and preliminary proposals, recommendations, or considerations, whether or not finalized or authorized, as well as those that have been adopted.

30.     The term "Plan Sponsor" means any business entity (e.g. self-funded employer, insurance company, union health plan) that is financially liable for prescription drug purchases on behalf of individuals pursuant to a Pharmacy Benefits Plan. Each Plan sponsor may offer multiple Pharmacy Benefit Plans.

31.     The term "Post-Sale Adjustment" means any additional compensation or reduction in compensation exchanged between the Company and a pharmacy after the point-of-sale transaction that changes the amount of a pharmacy was reimbursed for a prescription or related service.

32.     The term "Preferred Pharmacy" means any Relevant Entity that beneficiaries within a Pharmacy Benefits Plan are incentivized to use for prescription fulfillment.

33.     The term "Prescription" refers to the dispensing of a 30-day supply of a particular prescription drug product. In case of ambiguity, 90-day prescriptions requiring only one co-payment shall be counted as three Prescriptions.

34.     The term "Quantity Dispensed" means the number of units, grams, milliliters, or other relevant unit indicating the amount of an individual drug product included in a transaction or transactions.

35.    The uncapitalized term "reimbursement" means amounts paid to a pharmacy by a PBM for a dispensed drug or prescription service, including dispensing fees, patient copays, coinsurance, and other fees, payments, or discounts.

36.    The term "relating to" means in whole or in part constituting, containing, concerning, discussing, describing, analyzing, identifying, or stating.

37.    The term "Relevant Entity" includes all Retail Pharmacies, Chain Pharmacies, Independent Pharmacies, Specialty Pharmacies, long term care pharmacies, Pharmacy Services Administrative Organizations, and Mail-Order Pharmacies that dispense prescription drugs, including any Company-owned or affiliated pharmacies.

38.    The term "Retail Pharmacy" means any pharmacy that generally dispenses prescription drugs to patients in person. For avoidance of doubt, this term excludes both Specialty Pharmacies and Mail Order Pharmacies.

39.    The term "Specialty" or "Specialty Drug" means any drug product that has been included on any of the Company's Specialty Drug Lists (or any similar term or list indicating particular dispensing requirements) by the Company.

40.    The term "Specialty Drug List" means any list of prescription drugs that are referenced as "specialty" drugs (or any similar term indicating heightened requirements for pharmacies dispensing such drug products) by the Company.

41.    The term "Specialty Pharmacy" means a pharmacy that focuses primarily on dispensing FDA approved pharmaceuticals that are generally not dispensed by traditional retail pharmacies due to issues including but not limited to, those pharmaceuticals' special handling requirements, complex administration requirements, orphan drug status, high cost, complex patient monitoring requirements, and extensive insurance preapproval requirements.

42.    The term "Spread Price Amount" means the difference between the total amount paid by a PBM to a pharmacy for a prescription and the total amount paid by the Plan Sponsor to the PBM for the same prescription.

43.    The term "Total Amount Paid [to Relevant Entity]" means the amount reported as paid to the pharmacy in NCPDP Field #509-F9.

44.    The term "Transaction" means merger, acquisition (including asset purchases or acquisitions), consolidation, investment, joint venture, license, partnership, sale, or other transaction by or on behalf of the Company.

45.    The term "WAC" means wholesale acquisition cost.

46.    The term "30-Day Equivalent" refers to the method of prescription standardization outlined by CMS. If the days' supply reported on a prescription drug event is less than or equal to 34, the number of 30-day equivalent supplies equals one. If the days' supply reported on a prescription drug event is greater than 34, the number of 30-day equivalent

14

supplies is equal to the number of days' supply reported on each prescription drug event divided by 30.

## INSTRUCTIONS

For the purposes of this CID, the following Instructions apply:

I 1.    For each Specification marked with an asterisk (*), and to the extent any other responsive data exists electronically, provide your response(s) in an Excel spreadsheet with all underlying data un-redacted and all underlying formulas and algorithms intact, as specified in Instruction 8.

I 2.    Unless otherwise indicated, each Specification in this CID covers documents and information from January 1, 2017 through 30 days before the date on which the company provides the Commission with its final document submission, the executed certification form, and other compliance-related documents described in Instruction 15 (the "End Date"). The company shall preserve documents responsive to the CID created or received after the End Date until a Commission representative notifies the company that the investigation has ended.

I 3.    All references to year refer to calendar year.

I 4.    Unless otherwise specified, each Specification calls for information limited to the United States.

I 5.    Except for privileged material, the company will produce each responsive document in its entirety by including all attachments and all pages, regardless of whether they directly relate to the specified subject matter. The company should submit any appendix, table, or other attachment by either attaching it to the responsive document or clearly marking it to indicate the responsive document to which it corresponds. Attachments must be produced along with the document to which they are attached, regardless of whether they have been produced separately. Except for privileged material, the company will not redact, mask, cut, expunge, edit, or delete any responsive document or portion thereof in any manner.

I 6.    Compliance with this CID requires a search of all documents in the possession, custody, or control of the company, including, without limitation, those documents held by any of the company's officers, directors, employees, agents, representatives, or legal counsel, whether or not such documents are on the premises of the company. If any person is unwilling to have his or her files searched, or is unwilling to produce responsive documents, the company must provide the Commission with the following information as to each such person: his or her name, address, telephone number, and relationship to the company.

I 7.    Do not produce any Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI") prior to discussing the information with the Commission representative. If any document responsive to a particular Specification contains unresponsive Sensitive PII or SHI, redact the unresponsive Sensitive PII or SHI prior to producing the document.

The term "Sensitive PII" means an individual's Social Security Number alone; or an individual's name, address, or phone number in combination with one or more of the following:

- date of birth

- driver's license number or other state identification number, or a foreign country equivalent

- passport number

- financial account number

- credit or debit card number

The term "SHI" includes medical records and other individually identifiable health information, whether on paper, in electronic form, or communicated orally. SHI relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual.

I 8.  Form of Production: The company shall submit documents as instructed below absent written consent from the Commission representative.

a)  Documents stored in electronic or hard copy formats in the ordinary course of business shall be submitted in the following electronic format provided that such copies are true, correct, and complete copies of the original documents:

i)  Submit Microsoft Excel, Access, and PowerPoint files in native format with extracted text and metadata.

ii)  Submit emails in TIFF format with extracted text and the following metadata and information:

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the email. |
| Bates End | Bates number of the last page of the email. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |

17

| Metadata/Document Information | Description |
|---|---|
| Custodian | Name of the person from whom the email was obtained. |
| Email BCC | Names of person(s) blind copied on the email. |
| Email CC | Names of person(s) copied on the email. |
| Email Date Received | Date the email was received. [MM/DD/YYYY] |
| Email Date Sent | Date the email was sent. [MM/DD/YYYY] |
| Email From | Names of the person who authored the email. |
| Email Message ID | Microsoft Outlook Message ID or similar value in other message systems. |
| Email Subject | Subject line of the email. |
| Email Time Received | Time email was received. [HH:MM:SS AM/PM] |
| Email To | Recipients(s) of the email. |
| Email Time Sent | Time email was sent. [HH:MM:SS AM/PM] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Folder | File path/folder location of email. |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Text Link | Relative path to submitted text file. Example: \TEXT\001\FTC0003090.txt |

iii) Submit email attachments other than those described in subpart (a)(i) in TIFF format. For all email attachments, provide extracted text and the following metadata and information as applicable:

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of person from whom the file was obtained. |
| Date Created | Date the file was created. [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – typically SHA1 or MD5. |
| Native Link | Relative file path to submitted native or near native files.<br><br>Example: \NATIVES\001\FTC0003090.xls |
| Parent ID | Document ID or beginning Bates number of the parent email. |
| Text Link | Relative path to submitted text file. |

| Metadata/Document Information | Description |
|---|---|
| | Example: \TEXT\001\FTC0003090.txt |
| Time Created | Time file was created. [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved. [HH:MM:SS AM/PM] |

iv)  Submit all other electronic documents, other than those described in subpart (a)(i), in TIFF format accompanied by extracted text and the following metadata and information:

| Metadata/Document Information | Description |
|---|---|
| Alternative Custodian | List of custodians where the document has been removed as a duplicate. |
| Bates Begin | Beginning Bates number of the document |
| Bates End | Last Bates number of the document. |
| Beg Attach | First Bates number of attachment range. |
| End Attach | Ending Bates number of attachment range. |
| Custodian | Name of the original custodian of the file. |
| Date Created | Date the file was created. [MM/DD/YYY] |
| Date Modified | Date the file was last changed and saved. [MM/DD/YYYY HH:MM:SS AM/PM] |
| Page count | Number of pages in record |
| File size | Size of document in KB |
| File Extension | File extension type (e.g., docx, xlsx) |
| Filename with extension | Name of the original native file with file extension. |
| Hash | Identifying value used for deduplication – |

| Metadata/Document Information | Description |
|---|---|
|  | typically SHA1 or MD5. |
| Originating Path | File path of the file as it resided in its original environment. |
| Native Link | Relative path to submitted native or near native files.<br><br>Example: \NATIVES\001\FTC0003090.xls |
| Text Link | Relative path to submitted text file.<br><br>Example: \TEXT\001\FTC-0003090.txt |
| Time Created | Time file was created. [HH:MM:SS AM/PM] |
| Time Modified | Time file was saved. [HH:MM:SS AM/PM] |

    v)   Submit documents stored in hard copy in TIFF format accomplished by OCR with the following information:

| Metadata/Document Information | Description |
|---|---|
| Bates Begin | Beginning Bates number of the document. |
| Bates End | Bates number of the last page of the document. |
| Custodian | Name of person from whom the file was obtained. |

    vi)   Submit redacted documents in TIFF format accompanied by OCR with the metadata and information required by relevant document type in subparts (a)(i) through (a)(v) above. For example, if the redacted file was originally an attachment to an email, provide the metadata and information specified in subpart (a)(iii) above. Additionally, please provide a basis for each privilege claim as detailed in Instruction 10.

b)  Submit data compilations in electronic format, specifically Microsoft Excel spread-sheets or delimited text formats, with all underlying data un-redacted and all underlying formulas and algorithms intact. Submit data separately from document productions.

c)  Produce electronic file and TIFF submissions as follows:

   i)  For productions over 10 gigabytes, use hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data in USB 2.0 or 3.0 external enclosure.

   ii)  For productions under 10 gigabytes, CD-ROM (CD-R, CD-RW) optical disks and DVD-ROM (DVD+R, DVD+RW) optical disks for Windows-compatible personal computers, and USB 2.0 Flash Drives are acceptable storage formats. Alternatively, the FTC's secure file transfer protocol service may be used; contact the Commission representative for further instructions to submit productions using this method.

   iii)  All documents produced in electronic format shall be scanned for and free of viruses prior to submission. The Commission will return any infected media for replacement, which may affect the timing of the company's compliance with this CID.

   iv)  Encryption of productions using NIST FIPS-Compliant cryptographic hardware or software modules, with passwords sent under separate cover, is strongly encouraged.

d)  Each production shall be submitted with a transmittal letter that includes the FTC matter number; production volume name; encryption method/software used; list of custodians and document identification number range for each; total number of documents; and a list of load file fields in the order in which they are organized in the load file.

e)  If the company intends to utilize any de-duplication or email threading software or services when collecting or reviewing information that is stored in the company's computer systems or electronic storage media, or if the company's computer systems contain or utilize such software, the company must contact the Commission representative to determine, with the assistance of the appropriate government technical officials, whether and in what manner the company may use such software or services when producing materials in response to this CID.

I 9.  All documents responsive to this CID:

a)  shall be produced in complete form, un-redacted unless privileged, and in the order in which they appear in the company's files;

b)  shall be marked on each page with corporate identification and consecutive document control numbers when produced in TIFF format (e.g., ABC-00000001);

c) if written in a language other than English, shall be translated into English, with the English translation attached to the foreign language document;

d) shall be produced in color where necessary to interpret the document (if the coloring of any document communicates any substantive information, or if black-and-white photocopying or conversion to TIFF format of any document (e.g., a chart or graph), makes any substantive information contained in the document unintelligible, the company must submit the original document, a like-colored photocopy, or a JPEG-format TIFF);

e) shall be accompanied by an index that identifies: (i) the name of each person from whom responsive documents are submitted; and (ii) the corresponding consecutive document control number(s) used to identify that person's documents, and if submitted in paper form, the box number containing such documents. If the index exists as a computer file(s), provide the index both as a printed hard copy and in machine-readable form (provided that the Commission representative determines prior to submission that the machine-readable form would be in a format that allows the agency to use the computer files). The Commission representative will provide a sample index upon request; and

f) shall be accompanied by an affidavit of an officer of the company stating that the copies are true, correct, and complete copies of the original documents.

I 10. If the company withholds any responsive document or masks or redacts any portion of any responsive document based on a claim of privilege or work-product immunity, the company must provide the Commission with a log describing the privilege claim and all facts supporting the claim sufficient to comply with Federal Trade Commission Rule of Practice § 2.11. 16 C.F.R. § 2.11. For each document withheld, masked, or redacted, the log shall list the following: (a) specific grounds for claim of privilege or immunity, (b) type of document, (c) title, (d) author(s), (e) date, (f) addressees and recipients of the original document or any copy thereof (including persons "cc'd" or "blind cc'd"), (g) a description of the subject matter, with sufficient detail to assess the claim of privilege, (h) a description identifying each attachment to the document, (i) the page length of the document, (j) the relevant specification(s), and (k) for redacted documents, the document control number (as described in Instruction 9). Additionally, for each document withheld under a claim of attorney work-product immunity, the log will list: (l) whether the document was prepared in anticipation of litigation or for trial, (m) the other parties or expected other parties to the litigation and whether that party is adverse, (n) case number, (o) complaint filing date, and (p) court name. For each person listed, the log will include the person's full name, address, job title, and employer or firm; for each non-company recipient, include such additional description sufficient to show that individual's need to know the information contained in the document. Please denote all attorneys with an asterisk ("*").

The privilege log shall be submitted as a Microsoft Excel file.

An attachment to a document must be entitled to privilege in its own right. If an attachment is responsive and not entitled to privilege in its own right, it must be provided. The company must provide all non-privileged portions of any responsive document for which a claim of privilege is asserted, noting where redactions in the document have been made. With respect to documents withheld on grounds of privilege that discuss or describe any U.S. or foreign patent, each individual patent identified in the withheld document must be specified by its patent number.

I 11.    If the company is unable to answer any question fully, supply such information and data as are available. Explain why the answer is incomplete, the efforts made by the company to obtain the information and data, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the company to make an estimate, provide an explanation.

I 12.    If documents responsive to a particular Specification no longer exist for reasons other than the ordinary course of business or the implementation of the company's document retention policy, but the company has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the Specification(s) to which they are responsive, and identify the persons having knowledge of the content of such documents.

I 13.    Do not destroy or dispose of documents responsive to this CID, or any other documents relating to the subject matter of this CID. The destruction or disposal of such documents during the pendency of this investigation might constitute a felony in violation of 18 U.S.C. § 1505 and 18 U.S.C. § 1512.

I 14.    In order for the company's response to this CID to be complete, the attached certification form must be executed by the company official supervising compliance with this CID, notarized, and submitted along with the responsive materials.

I 15.    Compliance with this CID requires the company to submit to the Commission, on or before 30 days from the date on which this CID is signed, all responsive documents, data, information and the following:

a)    Executed and notarized certification form, which is included herewith;

b)    Privilege log according to Instruction 10, if any responsive documents are withheld or redacted;

c)    List of any persons (by name, address, telephone number, and relationship to the company) whose files have not been searched according to Instruction 6; and

d)    For each document submitted, information sufficient to identify the name of the person from whose files the document was obtained (document custodian), according to Instruction 9.

24

I 16.   Any questions you have relating to the scope or meaning of anything in this CID or suggestions for possible modifications thereto should be directed to Nicholas Leefer at (202) 326-3573. Please provide responses to the above specifications in electronic format via email or secure FTP wherever possible. If providing responses via email, please send your responses to Nicholas Leefer (nleefer@ftc.gov) For electronic transmission of materials by secure FTP, please coordinate with the staff listed above for further instructions. All submissions by secure FTP must be accompanied by an email notification of said submission to nleefer@ftc.gov. If you wish to submit your response by other means, please coordinate with the staff listed above for further instructions.

## CERTIFICATION OF COMPLIANCE

### Pursuant to 28 U.S.C. § 1746

I, _____, certify the following with respect to the Federal Trade

Commission's ("FTC") Civil Investigative Demand directed to Cigna Corporation (FTC File No.

2410005) (the "CID"):

1. The Company has identified all documents, information, and/or tangible things ("respon-

   sive information") in the Company's possession, custody, or control responsive to the

   CID and either:

   a. provided such responsive information to the FTC; or

   b. for any responsive information not provided, given the FTC written objections

      setting forth the basis for withholding the responsive information.

2. I verify that the responses to the CID are complete and true and correct to my knowledge.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _____          _____

                                                Signature


                                                _____

                                                Printed Name


                                                _____

                                                Title

**UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:        Lina M. Khan, Chair
                      Noah Joshua Phillips
                      Rohit Chopra
                      Rebecca Kelly Slaughter
                      Christine S. Wilson

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS
REGARDING ACTS OR PRACTICES
AFFECTING HEALTHCARE MARKETS**

**File No. P210100**

Nature and Scope of Investigation:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in unfair, deceptive, anticompetitive, collusive, coercive, predatory, exploitative, or exclusionary acts or practices in, or affecting commerce related to healthcare markets, including those regarding pharmaceuticals, pharmacies, pharmacy benefit managers, medical devices, hospitals, or other healthcare facilities or services, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended or any statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it, including subpoenas and orders to file special reports, be used in connection with any inquiry within the nature and scope of this resolution for a period not to exceed ten years. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period..

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq*., and supplements thereto.

By direction of the Commission.

April J. Tabor
Secretary

**Issued:  July 1, 2021
Expires:  July 1, 2031**

# Exhibit 3

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:  **Lina M. Khan, Chair**
**Noah Joshua Phillips**
**Rohit Chopra**
**Rebecca Kelly Slaughter**
**Christine S. Wilson**

**RESOLUTION DIRECTING USE OF COMPULSORY PROCESS**
**REGARDING ACTS OR PRACTICES**
**AFFECTING HEALTHCARE MARKETS**

**File No. P210100**

Nature and Scope of Investigation:

To investigate whether any persons, partnerships, corporations, or others have engaged or are engaging in unfair, deceptive, anticompetitive, collusive, coercive, predatory, exploitative, or exclusionary acts or practices in, or affecting commerce related to healthcare markets, including those regarding pharmaceuticals, pharmacies, pharmacy benefit managers, medical devices, hospitals, or other healthcare facilities or services, in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, as amended or any statutes or rules enforced by the Commission; and to determine the appropriate action or remedy, including whether monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it, including subpoenas and orders to file special reports, be used in connection with any inquiry within the nature and scope of this resolution for a period not to exceed ten years. The expiration of this ten-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the ten-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the ten-year period..

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, and 57b-1, as amended; and FTC Procedures and Rules of Practice, 16 C.F.R. § 1.1 *et seq*., and supplements thereto.

By direction of the Commission.

April J. Tabor
Secretary

**Issued:  July 1, 2021**
**Expires:  July 1, 2031**